## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

ELLEN PSYCHAS AND BONDING YEE |
    516 Archibald Walk, S.E.    |
    Washington, DC  20003     |
    (917)-536-2774        |

       Plaintiffs,      |

      v.           |

DISTRICT DEPARTMENT OF   |
    TRANSPORTATION    |
    55 M St., S.E.       |
    Washington, D.C. 20003   |
    (202) 673-6813      |

MATTHEW MARCOU      |
    55 M St., S.E.       |
    Washington, D.C. 20003   |
    (202) 673-6813      |

JOHN STOKES         |
    1100 4th St., S.W.     |
    Washington, D.C. 20003   |
    (202)-442-8354      |

      Defendants.     |

---

**Case: 1:18−cv−00081     Jury Demand**
**Assigned To : Jackson, Amy Berman**
**Assign. Date : 1/12/2018**
**Description: Pro Se Gen Civil  (F Deck)**

COMPLAINT FOR DAMAGES.
DECLATORY JUDGMENT, AND
AND INJUNCTIVE RELIEF

**RECEIVED**

**JAN 1 2 2018**

Clerk, U.S. District and
Bankruptcy Courts

JURY TRIAL DEMANDED

## INTRODUCTION

1.    This lawsuit challenges governmental malfeasance by a District of Columbia administrative agency – the District Department of Transportation (DDOT) – in regards to the public space construction permitting of a homemade, backyard 30 square-foot children's tree house/play fort in a large elm tree owned by a Capitol Hill family.  This lawsuit is being brought in Federal court principally to ensure fair adjudication of an incident that occurred on January 15, 2016, whereby an agency official hacked into Plaintiff Psychas' permitting account within the DDOT's Transportation Permitting Online System (TOPS).  TOPS is an on-line tool administered by DDOT to receive, and then review, applications for the issuance of permits

1

authorizing construction of structures extending into public space in the District of Columbia. The hacking incident constitutes a violation of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030.

2.      Defendant Stokes' hacking constituted an integral component of the agency's unlawful scheme to deprive Plaintiffs and their two (2) young daughters, then ages three (3) and five (5) years old, with the continued use and enjoyment of a tree house the family had built. The play fort was custom-designed, built, and decorated by Plaintiffs, with help from family and friends, at a cost of roughly $2,000. Since building the tree house, the structure has been meticulously maintained by Plaintiffs. Their daughters, now ages five (5) and seven (7), play in it regularly after school and on weekends, often with other neighborhood children. In addition, Plaintiffs like to hold knight-themed children's parties at the castle-styled play fort. Two (2) photographs of the tree house are provided in Exhibit A.

3.      Notably, in the last two (2) years, the tree house has become a community resource treasured by many young families living in the Capitol Hill neighborhood. Plaintiffs have given the public access to the play fort under controlled conditions through a series of well-advertised and attended public open houses. The open houses have been held on Federal holiday weekends. The tree house has also been made available to local children's summer camps and scouting groups as a bird-watching venue. All told, more than 250 local children have had a chance to enjoy a visit to the tree house since it was built. Photographs of enthusiastic community use of the tree house can be viewed at www.rescuetreehouse.com.

4.      Roughly one-third of the 30 square-foot tree house platform, an area measuring about 20" x 7', protrudes into public space over the public-private tree space/box abutting Plaintiffs' lot. This occupation of public space was authorized by DDOT under a valid "balcony" construction permit issued to Plaintiff Psychas by DDOT on November 9, 2015. The

permit then closed on November 20, 2015. Following the permit's closure, however, DDOT came under pressure from narrow special interests in the jurisdiction of Advisory Neighborhood Commission (ANC) 6B to withdraw the authorization under the permit.

5.       The January 15, 2016 hacking incident was executed to enable DDOT to begin a process for reversing (or giving the appearance of reversing) the agency's decision on November 9, 2015 to issue the permit. Rather than either respecting the permit's validity or moving to revoke the authorization, however, DDOT cleverly invented and executed a shortcut to re-open consideration of the issues surrounding the agency's granting of the public space permit two (2) months earlier. This was done in the guise of a purported requirement that Plaintiffs obtain "renewal" of their closed construction permit. Predictably, on January 28, 2016, when this matter came before the D.C. Public Space Committee (PSC), whose Chairman is the senior DDOT official heading DDOT's Public Space Regulations Division, the PSC voted to deny "renewal" of the permit granted to Plaintiff Psychas ten (10) weeks earlier.

6.       Following the PSC's denial of the permit "renewal," on January 28, 2016, Plaintiffs filed an appeal of the decision with the D.C. Office of Administrative Hearings (OAH) pursuant to 12A DCMR § 112.1. Relatedly, Plaintiffs also lodged a challenge with OAH over DDOT's issuance of a Stop Work Order issued on October 26, 2015 with respect to tree house construction, pursuant to 12A DCMR § 114.11. Both challenges were dismissed on jurisdictional grounds on May 19, 2016, and OAH denied reconsideration of that decision on June 3, 2016. However, Plaintiffs have continued their challenge of the Stop Work Order with the D.C. Court of Appeals, and the case is pending as of the date of the filing of this Complaint.

7.       It is Plaintiffs' understanding that from November 2016 to July 2017, the agency made several attempts to serve Notices of Violation (NOVs) upon Plaintiff Yee by certified mail. DDOT's attempts to effectuate service of the NOVs were unsuccessful, however, because each

3

NOV misidentified the legal name of Plaintiff Yee – instead of serving the NOVs to Mr.

Bonding Yee, Plaintiff Yee's legal name, DDOT served them to a "Bing Lee." In addition, none

of the NOVs were issued to Plaintiff Psychas, although the November 9, 2015 permit in question

had been issued in her name alone.

8.     Plaintiff Yee finally obtained receipt of an NOV in late August 2017, dated

August 23, 2017. This time, the NOV was posted on Plaintiffs' property. However, this notice

was not addressed to Plaintiff Yee's legal name, nor was it addressed to Plaintiff Psychas.

Instead, that NOV, as well as several later NOVs, were addressed to "Bing Lee." Each NOV

alleges that the tree house's protrusion into public space violates 24 DCMR § 2001.2.

9.     Plaintiff Yee filed timely answers to the four (4) most recently issued NOVs. At a

Status Conference held at OAH on November 29, 2017, Plaintiff Yee reiterated an earlier written

request he had made earlier that OAH appoint a mediator to facilitate settlement of all legal

issues surrounding the tree house permitting matter. However, DDOT declined to enter

negotiations under the auspices of 1 DCMR § 2815, even though the presiding administrative

law judge had already identified and arranged for a specific mediator to work with the parties.

10.     On December 20, 2017, Plaintiff Yee (Respondent to the NOVs) filed with OAH

a Motion to Dismiss the four (4) NOVs. Plaintiff Yee urged that they be dismissed because the

NOVs were not served properly. To the best of Plaintiffs' knowledge, DDOT then filed a

Motion with OAH in which the agency indicated that it did not oppose the December 20, 2017

Motion to Dismiss. Accordingly, on January 11, 2018, OAH granted the Motion to Dismiss with

respect to three (3) of the NOVs. However, Plaintiffs are presently unaware if OAH has made

any decision as to the remaining NOV. If the remaining NOV is not dismissed, an evidentiary

hearing is scheduled for January 29, 2018.

11.     If the remaining NOV is not dismissed, Plaintiff Yee will be requesting a stay, or indefinite postponement of the OAH evidentiary hearing, pending a decision by this court to resolve issues in this Complaint.  If DDOT is unwilling to consent to a stay, or if OAH is unwilling to direct postponement of the evidentiary hearing, Plaintiffs will request that this court issue a temporary restraining order to enjoin OAH from going forward with an evidentiary hearing to consider the remaining NOV that is pending.

12.     Even if the remaining NOV is dismissed, Plaintiffs have filed this Complaint because there continues to be a live case or controversy.  OAH did not dismiss the NOVs based on an evaluation of the relevant facts and applicable law.  Moreover, DDOT can at any time issue new NOVs regarding the tree house's use of public space without the service defects found in the previously issued NOVs.  In any event, this Complaint includes claims based on Defendants' violation of Plaintiffs' right to due process under the Fifth Amendment to the U.S. Constitution, which cannot now be cured by the agency's decision to withdraw or refrain from civil enforcement action.

13.     As noted, DDOT's permitting work in the tree house matter has been characterized by a series of unlawful actions to illegally withdraw Plaintiff Psychas' public space construction permit, which was approved on November 9, 2015 and closed on November 20, 2015.  DDOT would not have been in a position to violate the CFAA if the agency had not first fraudulently maneuvered Plaintiffs into participating in the PSC's consideration of a "renewal" of a closed construction permit.  Unbeknownst to Plaintiffs at the time, who had no prior experience with public space permitting in any jurisdiction, no "renewal" of a closed construction permit was ever legally required.  Moreover, Defendants never explained in writing the scope and legal basis of the agency's review in the "renewal" context.  Nor did the agency explain to Plaintiffs why the "renewal" necessitated extra scrutiny from an interagency body –

the Public Space Committee (PSC) – when the original permit did not.  Thus, in addition to claims under the CFAA, this Complaint includes claims that the agency's scheme to re-open consideration of a closed permit in the guise of consideration of an application for permit "renewal" violated due process under the Fifth Amendment to the U.S. Constitution.

14.     Plaintiffs are also including pendant claims under state law seeking declaratory relief.  One of the claims seeks to clarify that the November 9, 2015 permit remains a firm legal foundation that justifies the tree house's continued presence in public space over the public portion of the tree box abutting Plaintiffs' lot.  Additionally, Plaintiffs are including a pendant claim under state law seeking declaratory judgment that the tree house's use of public space never required a public space permit in the first place, pursuant to a provision in the D.C. Municipal Regulations (DCMR) authorizing "beautification" of tree spaces/boxes.

15.     While a permitting matter pertaining to a child's backyard play fort would not normally be the topic of litigation in Federal court, a violation of the CFAA is a serious Federal criminal offense.  Under the statute, it is unlawful to gain access to someone's on-line account without the account holder's express prior authorization.  In this instance, the unauthorized computer access was made by a government employee in connection with official business.  Accordingly, the matter warrants investigation to ascertain whether the misconduct should lead to criminal and/or agency disciplinary action.  In addition to filing this Complaint, Plaintiffs have provided information relating to the January 15, 2016 hacking incident to the Federal Bureau of Investigation (FBI), the D.C. Office of Inspector General, and the Metropolitan Police Department of the District of Columbia.  A copy of the complaint referral form generated following Plaintiffs' reporting of the January 15, 2016 incident to the FBI's Internet Crime Complaint Center is provided in Exhibit B.

16.     Plaintiffs' overarching objective in this case, and the other cases that are pending in this matter, is to protect the rights that DDOT conferred upon Plaintiffs to construct and maintain their children's tree house. Drawn-out litigation, lasting almost two (2) years to date, stems not only from the DDOT's permitting malfeasance and incompetence, but from the agency's intransigence and lack of common sense in declining to amicably settle a trifling public space management matter that has long since ceased to be an active controversy in the Capitol Hill neighborhood. DDOT's obstinacy was highlighted by the agency's rejection of OAH-supervised mediation to settle the case, on the strong recommendation of the presiding administrative law judge on November 29, 2017. If DDOT had been willing to settle the case under OAH supervision or had at any time over the last two (2) years been willing to move past the decision to issue Plaintiff Psychas' permit – which the agency apparently now regards as a mistake – this Federal lawsuit could have been avoided.

## JURISDICTION

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction) and 28 U.S.C. 1343 (civil right actions). Plaintiffs are seeking relief under a Federal statute that prohibits computer hacking, 18 U.S.C. § 1030. Plaintiffs are also alleging that Defendants' actions with respect to the tree house permitting violate the Fifth Amendment to the U.S. Constitution and 42 U.S.C. § 1983(g). Plaintiffs are entitled to compensatory damages, injunctive relief, or other equitable relief. This court may also issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02.

18.     This court has supplemental jurisdiction over Plaintiffs' pendant state law claims pursuant to 28 U.S.C. § 1367. If Plaintiffs' pendant state law claims had been filed in the Superior Court for the District of Columbia, the court would have had jurisdiction over the pendant state law claims pursuant to D.C. Code § 11-921(a).

19.     Venue is proper in the District of Columbia, because Defendant DDOT is an administrative agency of the District of Columbia Government, the individual Defendants are employees of DDOT, and all activities relevant to this action occurred within the District of Columbia.

## THE PARTIES

20.     Bonding (a.k.a. "Bing") Yee is a resident of the District of Columbia who has lived in the District since May 1993.  He is co-owner of the residential property at 516 Archibald Walk, S.E. Washington, DC 20003, which he purchased with his spouse, Ellen Psychas, in June 2011.

21.     Ellen Psychas is a resident of the District of Columbia who has lived in the District since June 2003.  She is the spouse of Bonding Yee and co-owner of the residential property at 516 Archibald Walk, S.E. Washington, DC 20003.  She conceived of the idea of building the children's tree house, was the sole grantee of DDOT permit No. PA #118910, issued by DDOT on November 9, 2015, and oversaw the play fort's construction by friends and family of Plaintiffs in August and September of 2015.

22.     DDOT is an administrative agency of the Government of the District of Columbia.  As stated on the agency's website at https://ddot.dc.gov/page/ddot-who-we-are, DDOT mission is to "[e]nhance the quality of life for District residents and visitors by ensuring that people, goods, and information move efficiently and safely, with minimal adverse impact on residents and the environment."  Relevant to this matter, DDOT is charged with carrying out the District of Columbia's regulations under Titles 12A and 24 of the DCMR applicable to the construction of fixtures within public space.  To this end, DDOT administers an on-line tool for receiving and then coordinating review of public space permit applications, known as the Transportation Online Permitting System (TOPS).

23.     Matthew Marcou is an employee of DDOT.  At all relevant times, he has served

as Associate Director of the Public Space Regulations Division, which has the authority to issue

or deny applications for use of public space in the District of Columbia.  Also, at all relevant

times, Defendant Marcou has chaired the Public Space Committee (PSC).  Under his leadership,

the PSC denied on January 28, 2016, a public space permit "renewal" application that was

ostensibly but not in actuality submitted by Plaintiff Psychas.

24.     John Stokes is employee of DDOT who is subordinate to Defendant Marcou.  At

all relevant times, his title has been City-Wide Permitting Manager.  He worked most closely and

directly with Plaintiff Psychas throughout the tree house permitting matter that is the subject of

this litigation.

## STATEMENT OF RELEVANT FACTS

25.     Plaintiffs are the owners of a residential property at 516 Archibald Walk, S.E.

Washington, DC 20003.  The backyard of the property is adjacent to the surface of Archibald

Walk, S.E., an out-of-the-way, "U"-shaped, public back alley paved in tinted orange concrete.

The width of the alley throughout the "U" configuration is approximately ten (10) feet.

26.     Within Plaintiffs' property, abutting a wooden rear patio fence, stands a large

century-old American elm tree.  The whole of the tree trunk is located within Plaintiffs' land

boundary, making the elm tree private property.   The base of the trunk is within a 7' x 2' mulch-

covered tree box, which straddles the eastern land boundary between Plaintiffs' property and the

public alley at the base of the "U."  Plaintiffs have taken responsibility for maintaining the tree

box abutting their lot since DDOT re-paved the alley in September 2011.

27.     In August – September 2015, Plaintiffs constructed a play fort in their elm tree.

Structural support for the tree house has been provided by two (2) 18" long x 2" diameter

metallic lag bolts that were drilled into the elm below the structure's platform, and by an existing

six (6)-foot-high wooden fence with posts laid in concrete that is set back from the western property boundary by approximately two (2) feet.   By using the fence to provide structural support to the tree house, Plaintiffs were able to build in an environmentally-friendly manner, drilling just two (2) giant lag bolts into the old tree to provide structural support rather than four (4) or five (5).   Plaintiffs had hired a DDOT Urban Forestry Administration (UFA)- recommended private arborist, Nova Arborist of NW D.C., to advise them on the proper care of the elm in building the tree house, and to help Plaintiffs design and construct the planned play fort in an environmentally-friendly manner.

28.     The tree house's platform height is approximately eight (8) feet.   Its platform area is seven (7) feet long x a little over four (4) feet wide, making for a total surface area of approximately 30 sq. ft.   The wooden structure rises over the entirety of the tree box and a section of Plaintiffs' rear patio.   The tree house projects lengthwise directly over the tree box. Roughly two-thirds of the play fort's platform area overhangs Plaintiffs' private property, while the remaining third overhangs the public portion of a wood-enclosed, mulch-covered tree box adjacent to Plaintiffs' wooden rear patio fence.

29.     Prior to commencing construction of the tree house, in July 2015, Plaintiff Psychas called the permitting hotlines for the D.C. Department of Consumer & Regulatory Affairs (DCRA) and DDOT.   She then visited the city permitting center with plan documents consisting of schematics which included hand-made sketch drawings, photographs of the work site, and several official land plats.   She called the hotlines and visited the center to ask which permits would be needed to build the proposed tree house.

30.     Specifically, in July 2015, Plaintiff called the city permitting hotline on two (2) occasions to inquire about tree house permitting.   One of Plaintiff Psychas' calls was put through to a city employee named Desiree Williams.   When Plaintiff Psychas asked Ms. Williams if she

would need permits to build a play fort which would slightly overhang the public section of a public-private tree box, Ms. Williams asked her about her proposed use of the tree space/box, to ensure that the proposed work did not violate "the tree space rules." Ms. Williams asked Plaintiff Psychas if her project work would fill the tree space/box adjacent to her lot with gravel in violation of the "the rules." She also asked if the proposed play fort's structural supports would be placed near the entrance to the alley, or in the tree space itself, or be more than nine (9) feet long or four (4) feet wide. Plaintiff Psychas replied "no" in answer to each question. Upon hearing this answer, Mr. Williams responded that she did not perceive "anything wrong" with what Plaintiff Psychas was proposing.

31.     When Plaintiff Psychas visited the city permitting center after calling the hotlines, she first conferred with DCRA permitting officials. She first learned through conversations with them that a DCRA-issued construction permit would not be necessary, because the platform of the proposed tree house would be less than less than 50 sq. ft. DCRA officials told Plaintiff Psychas that DCRA categorizes small D.C. tree houses as "non-permitted work" in the form of "accessory sheds" which do not require DCRA permits. *See* 12A DCMR § 105.2(8). Permitting officials also told her there was no reference to tree houses or play forts in the D.C. Municipal Code or in the D.C. Historic Preservation Rules either.

32.     At the DDOT desk of the permitting center, Plaintiff Psychas told junior permitting officials that she had been informed by DCRA colleagues that a construction permit would not be necessary for the proposed play fort project. DDOT responded that, since there is no construction permit category upon which the agency could piggyback to issue a public space permit for a projection off non-permitted work, there was no mechanism for DDOT to issue a permit to cover the small tree house overhang into public space. DDOT permitting officials then confirmed the guidance Plaintiff Psychas had already received from Ms. Williams that there are

tree space/box use rules for owners of adjacent lots, but that the play fort as proposed did not appear to violate any of the rules spelled out in 24 DCMR § 109.5.

33.     It was during Plaintiff Psychas' due diligence at the city permitting center that permitting officials recommended that she further consult with UFA, which is a separate unit within DDOT, before commencing construction of the tree house. She did as city permitting employees advised, ultimately retaining an UFA-recommended private arborist to advise Plaintiffs on the use of environmentally-friendly tree house construction methods.

34.     During the tree-house's five-week construction period over weekends in August – September 2015, none of the Plaintiffs' neighbors with a view to the work site complained to the family while the play fort was being built. However, in October 2015, more than a month after work on the tree house had been completed, both DCRA and DDOT received a belated objection to the construction of the play fort from Ms. Loraine Heckenberg. Ms. Heckenberg, who resides at 520 Archibald Walk, S.E., demanded to know why Plaintiffs had been allowed to construct a tree house without first obtaining applicable permits, and falsely claimed to city permitting authorities that the play fort had been built in a public tree and presented a public nuisance.

35.     Based on Ms. Heckenberg's inaccurate claims to the city about the tree house, DDOT conducted an external inspection of the structure on October 26, 2015. At the conclusion of the inspection, DDOT public space inspector Mr. Dirk Craig posted Work Site Stop Work Notification (Stop Work Order) #0237. The Stop Work Order indicated that it was being "issued for occupancy of public space without a valid permit" and directed that "[t]he house must be removed until the permit is obtained." Exhibit C.

36.     Following the issuance of Stop Work Order #0237, Plaintiffs cooperated with DDOT permitting officials to clarify the misunderstandings about the tree house's construction stemming from Ms. Heckenberg's complaints. On November 4, 2015, two (2) DDOT inspectors

met Plaintiff Psychas at the property to conduct a follow-up inspection. The two-man inspection team comprised Mr. James Henry, DDOT Supervisory Engineering Technician, an official in charge of inspections for half of the eight (8) city wards, and Inspector Craig. The inspectors reviewed a 15-page hardcopy file of tree house plan documents, which included official land plats and project schematics, that Plaintiff Psychas had prepared for the team. The inspectors took photographs and measurements of the land boundary and the play fort's exterior and interior dimensions. Inspector Craig climbed into tree house to take photographs and measurements of the interior. Plaintiff Psychas recounted the advice city permitting officials had given her to Mr. Henry, and gave him the names of city employees she had spoken to.

37.     At this second inspection of the play fort, the inspectors recognized that Plaintiffs are the sole owners of the host tree. The inspectors also judged that there was no basis to support Ms. Heckenberg's claim that the play fort constituted a public nuisance. Recognizing that the October 26, 2015 Stop Work Order's issuance had been based on factually incorrect information, Mr. Henry encouraged Plaintiffs to apply for a public space permit covering the tree house's use of 20" x 7' public airspace over the tree box abutting her lot's western land boundary.

38.     Mr. Henry also decreed that Plaintiff Psychas apply for a public space construction permit to cover the tree house's overhang, notwithstanding previous representations from junior agency colleagues that DDOT lacks a category under which a public space permit could be issued for a play fort considered "non-permitted" work by DCRA. Plaintiff Psychas was informed by Mr. Henry that he disagreed with the assessment of colleagues regarding the permitting status of the tree house. He wanted Plaintiff Psychas to apply for a public space construction permit covering the tree house's overhang for the structure to remain in public space.

39.     Mr. Henry directed Plaintiff Psychas to work with Mr. John Stokes, DDOT City-Wide Permitting Manager, at her earliest convenience, on applying for a public space projection permit to cover the tree house overhang.  Mr. Henry told her that while he could not guarantee that Defendant Stokes would agree to issue the permit, he felt confident that his colleague would for several reasons, which he gave.  Reason 1 was that the tree house was "nicely done," well-engineered in an environmentally-friendly manner, and "a positive thing" for local children. Reason 2 was that the structure's overhang into public space does not block travel in the alley, because it does not extend over a paved surface.  Reason 3 was that the play fort's projection into public space was small and not visible from any street.

40.     As a condition for supporting Plaintiff Psychas' permit application, however, Mr. Henry insisted that she consult with Mr. Gary Englebert, a senior DCRA construction permitting official.  Plaintiff Psychas had already spoken to this official about tree house permitting in July 2015.  Mr. Henry told her that she must confirm that DCRA really would not require a construction permit for the tree house.  Mr. Henry instructed Plaintiff Psychas to give Mr. Englebert a copy of her project plans before applying for a DDOT permit.  Further, Mr. Henry told Plaintiff Psychas that he planned to check with Mr. Englebert to confirm that the plans had been received, and that no construction permit was indeed required by DCRA.

41.     In addition, Mr. Henry required Plaintiffs to submit project documents to the D.C. Advisory Neighborhood Commission (ANC) representative whose territory includes the lot of 516 Archibald Walk S.E. before Plaintiff Psychas could apply for a DDOT projection permit.  In this case, this was Commissioner James Loots of ANC 6B-03.

42.     The day after the inspection, Plaintiff Psychas began doing what Mr. Henry had told her to do.  She dropped off manila envelopes containing hard copies of her project plans at Mr. Englebert's office at DCRA and at Commissioner Loots' home/place of business on

14

November 5, 2016.  Each envelope included a cover letter explaining her recent interaction with permitting officials and intention to apply for a DDOT public space permit.  Plaintiff Psychas knew of no objection to the issuance of a public space construction permit covering the tree house's small overhang into public space on the part of either Mr. Englebert or Mr. Loots before DDOT issued her "balcony" construction permit on November 9, 2015.

43.     On Friday, November 6, 2015, Plaintiff Psychas went to the DDOT permitting center at 1100 4th St., S.W. to ask Defendant Stokes to review her project plan documents, per Mr. Henry's recommendation.  Upon first meeting, Defendant Stokes informed Plaintiff Psychas that he had already been asked by "colleagues" to consider her application for a projection permit for a play fort, which Defendant Stokes understood to be "a small projection over a tree box that can't be seen from any street."

44.     Defendant Stokes asked Plaintiff Psychas whether she had given her project plans to Mr. Englebert and her local ANC Commissioner.  Ms. Psychas replied in the affirmative.

45.     Defendant Stokes reviewed each page of the project plan document file Plaintiff Psychas had brought with her, in her presence.  After examining the documents, he informed Plaintiff Psychas that they "looked good."  Defendant Stokes then informed her that he had selected what he believed to be the appropriate construction category for the projection permit, a "balcony" projection.

46.     Defendant Stokes then instructed a female colleague working at a desk located outside Defendant Stokes office to assist Plaintiff Psychas with the actual completion and submission of a public space permit application.  Together, Plaintiff Psychas and the colleague used a public computer at the DDOT permitting center to create an account in TOPS.  After the account had been opened, Plaintiff Psychas submitted her permit application on-line, with further guidance from the DDOT employee assisting her.

15

47.     After Plaintiff Psychas had finished her on-line permit application, she returned to Defendant Stokes' office to report that the application was complete.  Defendant Stokes then informed Plaintiff Psychas that he had decided that the permit would be open for ten (10) days before closing.  Plaintiff Psychas asked Defendant Stokes why the permit would close after only ten (10) days, observing that the DCRA construction permits she had previously been issued to cover a home renovation at a differ different D.C. residential property she and her husband own were of much longer duration.  In reply, Defendant Stokes told Plaintiff Psychas that he had been made aware of complaints from a neighbor to DDOT about her children's tree house. Accordingly, to help ensure that she would not have further trouble with the objecting neighbor, or others, with respect to the permitting of the play fort, he was approving a permit that would be open for a short time.  Having the permit close after just ten (10) days, he explained, would ensure that the tree house permitting matter would be put to rest quickly.

48.     Plaintiff Psychas queried Defendant Stokes as to whether she must take other steps to ensure that the permit would close correctly, so that the tree house could legally project into public space for as long as the structure stood in the host tree.  She asked Defendant Stokes if she needed to arrange for a follow-up DDOT inspection which would take place during the days when the permit would be open.  Defendant Stokes replied in the negative, stating that no second inspection would be required.  Further, he stated that the only steps required of Plaintiffs were to display one printout of the permit on the tree house itself, and another in a first-floor front window of 516 Archibald Walk, S.E. for the period during which the permit would be open.  He advised that once the permit had closed, the printouts could be taken down.  Finally, Defendant Stokes advised Plaintiff Psychas to ensure that any additional construction work on her children's tree house that she may undertake be completed during the ten (10) days before the permit closed.

49.     At no time during Plaintiff Psychas' interaction with Defendant Stokes on November 6, 2015 did he indicate to her that the permit being applied for was temporary in nature.  Nor did Defendant Stokes inform Plaintiff Psychas that further review would be required by ANC 6B, the PSC, or any other municipal body with jurisdiction over building construction or zoning.

50.     In fact, Plaintiff Psychas came and went from Defendant Stokes' office on November 6, 2015 without ever having heard of the PSC.  Indeed, prior consideration by the PSC of a public space permit application before DDOT issues the permit is an optional step, made at the discretion of the DDOT permitting officials involved in the review.  *See* Mayor's Order 2009-114.  56 D.C. Reg. 6862.

51.     On the morning of November 9, 2015, Plaintiff Psychas was surprised when she received an email notice from DDOT informing her that her permit application had been approved and was available for immediate pickup pending payment of the applicable fee. Exhibit D.  She had expected a longer processing time, at least a week, in order to allow sufficient opportunity for internal coordination and consultation with Mr. Englebert and Commissioner Loots if necessary.

52.     That afternoon, Plaintiff Psychas returned to the city permitting center to make payment and pick up the promised two (2) paper printouts of the permit.  The permit had been given the designation PA #118910, with effective dates of Nov. 10-20, 2015.  *Id.*  As stated on the face of the permit, it constitutes a "projection permit…for 20" projection over rear yard lot boundary on children's play fort/tree house built over property owner's tree box."  *Id.*  The permit also stipulated a number of conditions, none of which indicated, or even suggested, that the permit was temporary in nature, or that subsequent DDOT, ANC, or PSC review of Plaintiff Psychas' building project proposal would be required.  *See id.*

17

53.     From November 10-20, 2015, PA #118910 was conspicuously posted at 516 Archibald Walk, S.E. in accordance with Defendant Stokes' earlier instructions.  During this period, Plaintiffs made minor improvements to the play fort, to upgrade the structure's safety features.  The work undertaken during this period may not have needed approval under the permit, since it was performed on the tree house's east wall, in the area extending in air space over Plaintiffs' private property.

54.     Shortly after Plaintiffs posted PA #118910 on the tree house for display, in mid-November 2015, Ms. Heckenberg raised further issues with DDOT over the agency's issuance of the permit.  Ms. Heckenberg filed a D.C. Freedom of Information Act (FOIA) request to obtain documents relevant to DDOT's decision to issue that permit.  Among the documents provided to Ms. Heckenberg in response to her FOIA request was a four (4)-page summary of DDOT's deliberations over PA #118910 generated internally through a DDOT employee's TOPS account. Exhibit E.  Within that summary is an entry of "no" in response to the question of whether or not PSC consideration was required for this permit application.  Ms. Heckenberg later provided this document, as well as others, to ANC 6B to stir up controversy over the Commission's lack of involvement in the issuance of PA #118910, despite Plaintiff Psychas having given plan documents to Commissioner Loots on November 5, 2015 as directed by Mr. Henry.

55.     On the afternoon of December 9, 2015, Plaintiff Psychas received a telephone call from Defendant Stokes.  The purpose of his call was to inform her that Plaintiffs would need to go through an ANC and PSC review process so that they could "sign off on the permit." Defendant Stokes explained that this process was necessary in response to complaints from neighbors about the construction of the tree house.  This phone call was the first time that Plaintiffs heard anything from DDOT about the small tree house's small overhang into public space needing ANC and PSC review and approval.

56.     Responding to the information provided by Defendant Stokes, Plaintiff Psychas questioned him as to whether DDOT was planning to take away the permit based on the ANC's and PSC's further review.  In response, Defendant Stokes denied that Plaintiff Psychas' permit was in jeopardy, claiming that ANC and PSC review would be "just a formality to calm the neighbors who don't like your children's tree house down."

57.     On January 1, 2016, Plaintiffs received an email invitation from ANC 6B requesting their appearance before two (2) public meetings being held on Jan. 7 & 12, 2016 to discuss Plaintiffs' permit application.   Exhibit F.  Plaintiff Yee appeared at both hearings, to offer written and oral testimony.   At the two (2) hearings, he defended the merits of PA #118910 and highlighted the fact that Plaintiffs had followed DCRA and DDOT's direction and guidance in constructing the tree house without needing permits.  Plaintiff Yee emphasized that Plaintiff Psychas had obtained a permit to ratify the play fort's projection into public space on DDOT's recommendation, following the agency's issuance of Stop Work Order #0237.  He told the ANC 6B Commissioners that since the permit had already closed, he did not understand why the city review was being conducted after the effective period of the permit.

58.     Ms. Heckenberg had submitted a letter dated January 5, 2016 to ANC 6B to explain her opposition to the tree house and to express her concerns over DDOT's decision on November 9, 2015 to issue Plaintiff Psychas' permit.  Exhibit G.  According to her letter, she explains that she had a conversation with Defendant Stokes in late November 2015, in which he states that had been told by Mr. Elliott Garrett, DDOT's Chief Public Space Inspections and Enforcement Officer, "to issue the permit that way" (i.e. as a balcony permit).  *Id.*  Ms. Heckenberg's letter also reveals that Defendant Stokes had told her that "the permit would not necessarily need to go through the Public Space Committee (PSC) because the chair could conduct some sort of side approval that would circumvent the PSC."  *Id.*  At the ANC meetings,

19

Ms. Heckenberg and other neighbors explicitly raised objections to how DDOT had decided to circumvent ANC and PSC review in issuing PA #118910.

59.     At the January 12, 2016 meeting, ANC 6B voted confusingly to oppose the "application" for the already-issued permit PA #118910, focusing only on the type of permit that was issued. *See* Exhibit H. In its letter to the PSC, ANC 6B observed that the permit application had been classified as one for a balcony projection despite an apparent prohibition on a balcony being approved to project over alley surface space. *See* 12A DCMR § 3202.10.1. ANC advice to city agencies is not binding, however, and no evidence has surfaced to indicate that the PSC relied on ANC 6B's reasoning in its later actions involving permitting of the small tree house overhang into public space. *See* D.C. Code § 1-309.10(d)(3)(A).

60.     Plaintiffs learned during the January 7 and 12, 2016 meetings before ANC 6B that the PSC had scheduled consideration of Plaintiffs' tree house public space permit for January 28, 2016. However, Plaintiffs never received any official written notice from DDOT or the PSC describing the scope and nature of the PSC's forthcoming review before (or even after) January 28, 2016. The city never informed or explained the legal basis of the PSC's review to Plaintiffs. In the absence of such notice, and without any experience with or specialized knowledge of municipal public space permitting processes, Plaintiffs could only make uninformed guesses as to the scope and nature of PSC review, and the rules and standards governing the review process. Optimistically, with confidence in Defendant Stokes' representations to Plaintiff Psychas being truthful, Plaintiffs hoped that DDOT was trying to paper-over its apparent error in issuing a wrong type of permit for a projection over alley space, as noted by ANC 6B, by using the PSC to authorize the issuing of a different type of projection permit. Pessimistically, Plaintiffs feared that the PSC meeting was being held to enable DDOT to legally revoke Plaintiff Psychas' balcony construction permit through the exercise of the authority under 12A DCMR § 105.6.

Plaintiffs have since learned that the PSC lacks the authority under Mayor's Order 2009-114 to revoke any kind of permit.

61.     During the course of ANC 6B's review of PA #118910, the tree house permitting matter began attracting attention from local media.  In early January 2016, the story was covered by local television stations—WJLA ABC7, 4 NBC Washington, WUSA 9CBS and Fox 5 DC-- and the *Washington Post*.   By the end of January, the story had made the national news in *Slate Magazine* and *USA Today*.  See www.rescuetreehouse.com for links to four (4) dozen media and blog reports.  On January 15, 2016, the *Washington Post* published an article reporting on views expressed by Defendant Marcou, identified in the article only as an associate director for the Public Space Regulation Administration of DDOT, although he also serves as Chairman of the PSC.  The article reported Defendant Marcou as having expressed a critical view of Plaintiffs' actions on the tree house matter and is attributed on the record as saying "the couple should have obtained permits, and a review should have been done before the city's public space committee before the treehouse was built."[1]  The article also reported that unnamed city officials had expressed the view that although the city had issued a permit in November after an inspector looked at the property, a review to allow the tree house in public space was needed instead.

62.     On the same day the *Washington Post* article appeared in print, January 15, 2016, Plaintiff Psychas received an email message from Defendant Stokes.  Exhibit I.  In the message, he communicated to Plaintiff Psychas that he updated the password in her TOPS account to a default password ("Password1").  Using this default password, Defendant Stokes then accessed Plaintiff Psychas' TOPS account.  In the email, Defendant Stokes stated that he "needed to go

---

[1] The full article is available through the *Washington Post*'s website, at https://www.washingtonpost.com/local/this-treehouse-extends-20-inches-into-an-alley-and-its-dividing-the-neighborhood/2016/01/14/cfa5338c-bb0f-11e5-829c-26ffb874a18d_story.html?utm_term=.5bc9ea446240.

into your account to create an active permit application for the tree house prior to the 1/28
meeting so that comments could be uploaded prior to the meeting." *Id.* The email he sent to
Plaintiff Psychas to memorialize hacking into her account is indication that he was either
unaware that his actions in this regard were a potentially actionable criminal offense under the
CFAA, or that he knew his actions were unlawful, but did not expect Plaintiffs to realize this, to
report them to the authorities, or to challenge them in a court of law.

    63.    In creating an active permit application, Defendant Stokes did not reopen the case
file for PA #118910.  Rather, he submitted an entirely new application for "renewal" of PA
#118910.  The "renewal" application was given the designation PA #121865.  When Plaintiff
Psychas accesses her TOPS account, she can clearly see that there were two (2) different permit
applications, with different dispositions by DDOT, for PA #118910 and PA #121865.  Exhibit J.

    64.    Plaintiff Psychas was angered to learn that Defendant Stokes had gone into her
TOPS account to apply for a new public space projection permit in her name.  She had not given
Defendant Stokes permission to change the password she had established for her TOPS account
on November 5, 2015 to a default password.   In addition, she had not given Defendant Stokes
authorization to enter into her TOPS account using the newly-created default password to submit
on her behalf an application for "renewal" of PA #118910.  If she had wanted to apply for a new
projection permit, she would have completed and submitted a permit application herself, and if
she had wanted Defendant Stokes to go into her account, she would have given him her
password.

    65.    Moreover, Plaintiffs never expressed to DDOT any desire to extend the tree
house's construction period beyond the November 20, 2015 closing date of PA #118910.
Plaintiffs had no rational reason for requesting renewal of their permit because play fort
construction, other than the addition of a safety net along the east wall, had been completed two

(2) months beforehand, in September 2015.  Indeed, Plaintiff Psychas only agreed to submit an application for the original public space permit to serve as a *post hoc* ratification of the already-built structure based on the insistence of Mr. Henry in November 2015.

66.     After reading Defendant Stokes' email notice on the morning of January 15, 2016, Plaintiff Psychas left an angry voicemail message demanding to know why he had entered into her TOPS account to submit an application for a permit "renewal."  In response, Defendant Stokes phoned her back that afternoon to reiterate the claims he had made in his email.  He told her that he had needed to initiate a permit renewal to helpfully enable colleagues to provide comments on the application before the PSC meeting on January 28, 2016.  Defendant Stokes reassured Plaintiff Psychas that PSC review would "just be a formality."  He said this to her several times.

67.     In her conversation with Defendant Stokes on January 15, 2016, Plaintiff Psychas expressed skepticism to him about his reassurances that PSC consideration would "just be a formality."  She did so after having read the *Washington Post's* report which included Defendant Marcou's biased statement criticizing Plaintiffs for not having submitted to a city review of the construction permit before the tree house was built.  Plaintiff Psychas reminded Defendant Stokes that no city agency had required her to submit to ANC or PSC review of a construction permit application to date.

68.     In response, Defendant Stokes downplayed Defendant Marcou's statements, to the effect of "[d]on't worry about Marcou's statement to the *Washington Post*.  DDOT just needs to make certain statements after neighbors have complained about a construction project covered by a public space permit."  Defendant Stokes also tried to dispel the notion that Plaintiffs' permit was under threat, indicating to the effect that "[e]verything would be fine at the PSC."  As a puzzling aside, Defendant Stokes also advised Plaintiff Psychas to not attend the PSC meeting.

23

He told her that she would not need to attend the meeting because the permitting of the tree house would be presented as a *pro forma* matter to the PSC under the "consent agenda."

69.     On the morning of January 28, 2016, the PSC held its public meeting to review the application for PA # 121865 under the pretext that it was considering an application submitted by Plaintiffs for "renewal" of the original permit PA #118910.   Contrary to Defendant Stokes' reassurances, the matter was placed for full consideration by the PSC, not as a *pro forma* matter under the consent agenda.   Plaintiff Yee attended to give oral testimony to supplement the written statement Plaintiffs submitted to the PSC for its consideration on January 26, 2016. Exhibit K. (written statement only; attachments omitted).

70.     In the written testimony, Plaintiffs indicated that they were confused by the exact purpose of the January 28, 2016 hearing.   Plaintiffs noted that the permit application for PA #121865 had been submitted on behalf of Plaintiffs and expressed that they could not discern whether DDOT was reviewing the old permit (PA #118910) or was reassessing the grant of that permit through a renewal process that was not initiated by Plaintiffs.   *Id.*

71.     At the January 28, 2016 PSC meeting, chaired by Defendant Marcou, which the *Washington Post* covered, Plaintiff Yee sought an answer as to how it was proper for the PSC to be considering a permit renewal when the holders of the original permit did not desire, or request, such a renewal.   Defendant Marcou quickly deflected this question, however, by successfully steering the Committee's discussion toward other relevant topics.   After the PSC voted to deny the permit "renewal," Plaintiff Yee realized that he could have pushed Defendant Marcou much harder to give a straight answer on the record to the critically important question of whether PSC review of a closed construction permit in the guise of considering its "renewal" was lawful.

72.     At the conclusion of the PSC's consideration of the permit "renewal," the panel

voted to deny, with an abstention by the DCRA-Construction representative on the PSC, Mr.

Chris Bailey.  Mr. Bailey is on record as evoking 12A DCMR § 105.2(8) in fostering consensus

that the tree house Plaintiffs built for their children does not require a DCRA construction permit

for the portion that overhangs Plaintiffs' private property.

73.     Within 15 minutes of the PSC's public consideration and announcement of its

decision on PA #121865, Plaintiffs went to Defendant Stokes' office and asked to speak to him.

Defendant Stokes agreed to speak to Plaintiffs.   In the meeting, Defendant Stokes expressed

apparent surprise at the PSC's decision, claiming that he had not expected the PSC to deny the

permit renewal.  When Plaintiff Yee asked him whether PA #118910 had been revoked,

Defendant Stokes said that he did not know.  Defendant Stokes did tell Plaintiffs, however, to

expect to receive a civil fine notice for the tree house's continued occupation of public air space

within the next two (2) weeks.  Defendant Stokes further advised that the notice would assess

progressive fines if the play fort was not removed from public space within a specified

timeframe, almost certainly 30-60 days.

74.     Anticipating that the PSC would be issuing a written order shortly, directing that

the tree house be removed from public space (by Plaintiffs destroying it) within one or two (2)

months, Plaintiffs transmitted an email on February 2, 2016 to Defendant Marcou.  Exhibit L

The email asked if DDOT would accord Plaintiffs at least 90 days to arrange for the tree house to

be removed from public space, during the early spring, a more environmentally-friendly time to

remove lag bolts drilled into the old elm tree than the winter months.

75.     Plaintiffs received no response to their email from Defendant Marcou or any of

his underlings responding substantively to Plaintiffs' February 2, 2016 request.  Instead, the PSC

issued a letter to Plaintiff Psychas back-dated to January 28, 2016 (which Plaintiffs did not

receive until February 11, 2016). Exhibit M. The letter merely memorialized the PSC's decision to deny the permit "renewal" application under PA #121865 and explain the PSC's reasoning. Strangely, the letter did not instruct Plaintiff Psychas to take any action in regard to the tree house in any timeframe. The letter made no reference to permit PA #118910, or a ruling that the original permit had been revoked. Nor did the letter order the removal of the play fort from public space by a specified deadline. The only tracking number found in the letter was for PA #121865, the number associated with the application for a permit "renewal." Moreover, the letter confusingly referred to the already-constructed tree house as a "proposed" structure, although it had been built more than four (4) months earlier. Plaintiffs had no idea what to make of the letter, and did not understand why it was not accompanied by a document styled as a civil fine notice, consistent with what Defendant Stokes had told Plaintiffs to expect in their meeting with him right after the PSC hearing on January 28, 2016.

76.    On February 16, 2016, Plaintiffs transmitted an email to Ms. Catrina Felder, the DDOT official who had signed the PSC letter on behalf of the PSCs Executive Secretary, Ms. Bernadette Edwards, to try to gain clarification of the meaning and intent of the PSC's back-dated letter. Exhibit N. Plaintiffs wrote to Mr. Felder to ask what legal effect a denial of the permit application had on the original permit, PA #119810, that had closed on November 20, 2016. Plaintiffs pointedly asked: "We would like DDOT to tell us what the status of the original permit is." To date, DDOT has issued no official reply to this penultimate question.

77.    On February 23, 2016, after not having received any answers from DDOT in response to their questions about the PSC decision and the status of PA #11890, Plaintiffs filed concurrently with OAH two (2) challenges concerning DDOT's tree house permitting actions to date. The first challenge pertained to the Stop Work Order issued by DDOT on October 26, 2015. The second challenge pertained to the PSC's denial of PA #121865. Plaintiffs styled the

second challenge as an "Appeal of Denial and Notice of Infraction Issued by the Department of Transportation." In titling the second challenge in this way, Plaintiffs were bearing in mind their conversation with Defendant Stokes immediately following the PSC's vote on January 28, 2016, during which he warned Plaintiffs that a penalty notice would be quickly forthcoming. Plaintiffs were acting out of an abundance of caution in case the PSC letter could be construed to be a penalty notice and did not want a default judgment to be entered.

78.     On February 24, 2016, OAH issued an Order directing the parties to appear for a Status Conference on March 17, 2016. Prior to the Status Conference, on March 14, 2016, per Plaintiffs' request, they met with Mr. Henry, Mr. Craig, and Mr. Michael OConnell, Assistant General Counsel for DDOT, at the agency's SW headquarters. The purpose of this meeting was twofold: (1) to exchange ideas for settlement of the tree house permitting matter and (2) for Plaintiffs to gain clarification of the status of the original permit PA #118910 in light of the unintelligible text in the backdated January 28, 2016 letter from the PSC.

79.     At the March 14, 2016 meeting, Plaintiff Yee posed to the DDOT officials present the question of whether or not PA #118910 had been revoked. In response, Mr. Henry answered in the negative. The DDOT officials present were able to clarify, however, that the PSC letter did not constitute a penalty notice. They also committed DDOT to not taking any enforcement action against the tree house until November 2016.

80.     Settlement negotiations continued through April 28, 2016, when OAH issued an *Order to Show Cause* expressing concerns as to whether it had jurisdiction to hear Plaintiffs' appeal of the PSC decision and whether their simultaneous challenge to the Stop Work Order was moot. Plaintiffs (Petitioners at OAH) were directed to file a brief addressing the court's concerns, which they did so on May 18, 2016. No direct negotiations have taken place between Plaintiffs and DDOT officials since the day OAH issued the *Order to Show Cause*.

81.     OAH issued an *Order of Dismissal* on May 19, 2016.  Plaintiffs (Petitioners) then

filed for reconsideration, but on June 6, 2016, OAH issued a decision denying reconsideration.

Plaintiffs then filed a Petition for Review of OAH's decision with the District of Columbia Court

of Appeals on July 11, 2016.  The case number associated with Plaintiffs' Petition for Review is

16-AA-0688.  This appeal is currently pending.

82.     On November 14, 2016, Plaintiffs received an email from Mr. Garrett, in which

this senior public space inspections and enforcement official stated that he was "following up on

the matter to relocate the tree house from public space."  Exhibit L.  The email recited verbatim

language from the PSC letter backdated to January 28, 2016 and referenced OAH's May 19,

2016 decision to dismiss Plaintiffs' appeal of the PSC's decision.  Mr. Garrett inquired as to

whether the tree house had been removed from public space and indicated that the agency would

undertake a re-inspection of the play fort location shortly.  *Id.*

83.     As of November 14, 2016, Plaintiffs were operating under the belief that the most

likely legal avenue on which DDOT would base enforcement action in this case would be to

allege a violation of the October 26, 2015 Stop Work Order.   Therefore, on November 17, 2016,

Plaintiff Yee transmitted an email reply to Mr. Garrett to make certain that he was aware that

Plaintiffs had appealed OAH's decision to the D.C. Court of Appeals.  *Id.*  Plaintiff Yee did not

ask the court for a stay requiring that DDOT refrain from enforcement action while Plaintiffs'

appeal was pending but was prepared to file such a motion.  Plaintiff Yee's email to Mr. Garrett

also expressed his continued willingness to work toward reaching a mutually agreeable

settlement of the tree house permitting matter with DDOT.

84.     Supplementing Plaintiff Yee's email reply, Plaintiffs also dropped off hardcopies

of a two-page letter to Inspector Garrett and other agency officials.  Exhibit O.  The letter had

several objectives.  First, the letter served as an official request to the agency for it refrain from

taking enforcement action pending resolution of Plaintiffs' appeal to the D.C. Court of Appeals, as required under D.C. App. R. 18(a)(1). Also, Plaintiffs wanted to communicate to agency officials why Plaintiffs had decided to keep the tree house as-is without removing it from public space. Earlier, while Plaintiffs' appeal of the Stop Work Order and the PSC's decision was still pending before OAH, Plaintiffs and DDOT engaged in settlement discussions during which Plaintiffs expressed a willingness to move the tree house partly, but not wholly, out of public space. Those negotiations abruptly collapsed after the presiding judge at OAH issued her *Order to Show Cause* on April 28, 2016. The letter explained that Plaintiffs had come to the conclusion that it would not be feasible to move the tree house without damaging the old tree extensively, and rendering the structure unsafe for young children to play in. The letter explained forcefully that Plaintiffs' position had hardened since the parties had last met, and that Plaintiffs were willing to litigate the matter to vindicate their rights under PA #118910.

85. In an email response to Plaintiff Yee's email on November 17, 2016, Mr. Garrett said that he would "leave the issues before the Court in the capable hands of our legal team." Exhibit L. Mr. Garrett did not indicate that DDOT planned to take enforcement action right away, but Plaintiffs perceived Mr. Garrett's tone as indicating a predisposition toward issuing civil fines at a more appropriate time. In this regard, he noted that he was "charged to enforce the order issued by the Public Space Committee and my goal is to ensure compliance to this order." *Id.*

86. Unknownst to Plaintiffs, in the nine (9) months following Mr. Garrett's reply to them, DDOT inspectors issued a series of NOVs on Plaintiff Yee, with the first fine notice being issued as early as November 2016. To Plaintiffs' knowledge, each NOV was sent by certified mail in the November 2016 – July 2017 timeframe. However, none of these NOVs was received, because each was addressed to Plaintiff Yee in the wrong name, meaning that he was

unable to collect the NOV at the local U.S. Post Office. Plaintiff Yee finally received an NOV in late August 2017, on which the date August 23, 2016 appears on the first page. Upon reading this NOV, Plaintiff Yee learned for the first time that DDOT was not proceeding under the theory that the tree house's continued presence in public space violates the October 26, 2015 Stop Work Order. Rather, the agency was alleging a violation of 24 DCMR § 2001.2, prohibiting obstruction of travel in public space.

87.     DDOT attempted to serve yet another NOV on September 28, 2017, again alleging a continuing violation of 24 DCMR § 2001.2. DDOT then attempted to serve two (2) additional NOVs invoking the same provision on October 12, 2017. Again, these three NOVs were addressed only to "Mr. Bing Lee," although Plaintiffs' legal names are Mr. Bonding Yee and Ms. Ellen Psychas.

88.     Plaintiff Yee filed with OAH timely Answers to each of the NOVs. In all four (4) of his Answers, Plaintiff Yee requested that OAH schedule a Status Conference, at which he could make a Special Appearance to challenge the propriety of DDOT's service in each case.

89.     On November 7, 2017, OAH directed that the parties appear for an Evidentiary Hearing on November 29, 2017. Plaintiff Yee again raised the issue of improper service of the four (4) most recent NOVs in a letter filed with OAH on November 22, 2017. In a response dated November 28, 2017, OAH changed the subject of the hearing scheduled for the next day to a Status Conference.

90.     At the November 29, 2017 Status Conference, Plaintiff Yee was able to present arguments relating to DDOT's improper service of the NOVs. Rather than rule immediately, however, the presiding judge directed Plaintiff Yee to file a written motion for dismissal of the NOVs. Per the schedule set forth by the presiding judge, Plaintiff Yee submitted his Motion to Dismiss on December 20, 2017. Plaintiff Yee's arguments to OAH were as follows:

    a.  DDOT failed to use Plaintiff Yee's legal name in the NOV.  In addition, DDOT did not identify Plaintiff Psychas, who is a co-owner of 516 Archibald Walk S.E.

    b.  Service of the August 23, 2017 NOV is invalid because the Certificate of Service associated with it was undated.

    c.  Service of the remaining three (3) NOVs is invalid because they were not delivered to Plaintiffs by personal service, certified mail, or conspicuous posting, as required under 24 DCMR § 1305.1.

91.    In addition to considering how to handle the jurisdictional concerns that Plaintiff Yee raised about service of the NOVs, the presiding OAH administrative law judge queried the parties as to their willingness to re-start settlement negotiations under the auspices of an OAH-appointed mediator.  The presiding judge told the parties that she had already retained a mediator to work with them.  Plaintiff Yee had suggested this avenue to try to resolve the tree house matter in his November 22, 2017 letter to OAH.  However, DDOT rejected mediated settlement negotiations under OAH auspices.  Consequently, the presiding judge directed that an evidentiary hearing be convened on January 29, 2018 in the event that she ruled against Plaintiff Yee on the Motion to Dismiss.

92.    Each of the NOVs purport that Plaintiff Yee is in violation of 24 DCMR § 2001.2, which states that "[n]o person shall construct, place, leave, or cause to be constructed, placed, or left on any public space any obstruction to travel, without first obtaining a permit from the District."  Thus, to prove a violation, DDOT would have to establish both that the tree house is not authorized by a valid construction permit, and that the structure presents an obstruction to travel, although its small projection into public space extends only over a wood-enclosed, mulch-covered tree space/box, not a paved surface.

93.    Included in each of the NOVs is an Inspector Report where various DDOT inspectors characterize PA #118910 as "expired and has not been renewed."  *See* Exhibit P. Based on this characterization, Plaintiffs anticipate that if given the opportunity, DDOT will

disingenuously argue that PA #118910 was effectively revoked by the PSC in the guise of its consideration of the "renewal" under PA #121865.

94.     Alternatively, DDOT may intend to mislead OAH into believing that PA #118910 was merely an interim permit for temporary occupation of public space.  However, Plaintiffs know through Ms. Heckenberg's FOIA request that a DDOT employee can generate a view in TOPS that clearly distinguishes Construction permits from temporary PS (i.e. public space) Rental Permits.  *See* Exhibit Q.  Furthermore, record evidence from TOPS shows that the construction category was selected for PA #118910.  *See* Exhibits E & J.

95.     The Inspector Report included with each of the NOVs also claim that the PSC directed that Plaintiffs' tree house "should be removed from public space."  However, no such quoted language can be found on the face of the PSC's written decision regarding the permit "renewal" in early 2016.  *Compare* Exhibit M *with* Exhibit P.  Indeed, if PA #118910 was only a temporary permit, then PA #121865 would also have been a temporary permit if approved because the period that Defendant Stokes applied for on behalf of Plaintiff Psychas, via hacking and then accessing her TOPS account without authorization, was November 21, 2015 – February 29, 2016.  *See* Exhibit J.

96.     On January 11, 2018, Plaintiff Yee received written notification from OAH that it had dismissed three (3) of the four (4) NOVs.  However, Plaintiff Yee has not yet been able to determine whether there has been any disposition of one remaining NOV, which was issued on October 12, 2017.  The fine sought in the NOV that is still outstanding is $2,000.

97.     In addition to assessing monetary civil penalties, the outstanding NOV seeks "abatement" (i.e. destruction) of the children's tree house.  Plaintiffs estimate that the cost of removing the structure from public space in a safe and environmentally friendly manner, and

then constructing a comparable replacement play fort wholly within their property boundary, at $5,000.

98.     Plaintiffs have received no assurances from DDOT that it will refrain from any further attempts to assess civil fines against Plaintiffs for the tree house's presence in public space, based on the argument that Plaintiffs are in violation 24 DCMR § 2001.2. The recent dismissal of the aforementioned NOVs may only be a temporary reprieve, based largely on the jurisdictional and service issues raised by Plaintiff Yee at OAH.

99.     Plaintiff Psychas is prepared to offer sworn testimony under direct and cross-examination describing her recollection of her conversations with DDOT and DCRA permitting officials throughout the tree house permitting matter. She previously executed an Affidavit recounting her interactions city permitting officials, which was submitted to the PSC in the lead-up to the January 28, 2016 public meeting. Plaintiff Psychas has executed a more detailed Affidavit for this Complaint. Both Affidavits are included within Exhibit R.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### (as to all Defendants)

100.     Plaintiffs re-incorporate and re-allege each and every allegation contained above as if fully set forth herein.

101.     The Computer Fraud and Abuse Act prohibits anyone from intentionally accessing a protected computer without authorization in a manner that would recklessly cause damage. 18 U.S.C. § 1030(a)(5)(B).

102.     DDOT's TOPS on-line tool, which is only accessible and usable by the general public through the Internet, is a protected computer within the meaning of 18 U.S.C. § 1030(e)(2)(B).

103.    Defendants violated 18 U.S.C. § 1030(a)(5)(B) on January 15, 2016 when DDOT's employee, Defendant Stokes, changed Plaintiff Psychas' pre-existing password in her TOPS permitting account without her prior authorization, and then submitted an application for a public space permit "renewal" on her behalf without her permission. Defendant Stokes acted under the direct supervision of Defendant Marcou. Defendants undertook this action knowing that Plaintiffs did not require, and were not seeking, authorization to perform further construction work on their children's play fort.

104.    Defendant Stokes' unauthorized submission of an application for permit "renewal" on behalf of Plaintiff Psychas was an essential element of the agency's scheme to establish a *post hoc* mechanism for ANC and PSC to reconsider the issues surrounding whether Plaintiffs should have been issued a construction permit on November 9, 2015. Defendants' goal in this regard was to withdraw the closed permit without having to lawfully revoke it. Thus, the agency utilized a well-orchestrated permitting trick to illegally withdraw authorization of the construction of a tree house extending slightly into public space.

105.    But for Defendant Stokes' intentional unauthorized access of Plaintiff Psychas' TOPS account on January 15, 2016, the PSC would have lacked an opportunity to consider and then deny an application for "renewal" of the public space permit ostensibly, but not actually, submitted by Plaintiff Psychas.

106.    Defendant DDOT is now relying on the PSC's January 28, 2016 denial of Plaintiffs' application for a permit "renewal," DDOT as a basis for issuing four (4) NOVs against Plaintiff Yee from August – October 2017. At this time, one is still currently pending consideration by OAH. This NOV seeks to assess a civil fine in the amount of $2,000 upon Plaintiff Yee. DDOT is also seeking "abatement" (i.e. destruction) of a play fort that has become popular with young families residing in the Capitol Hill neighborhood. Plaintiffs

estimate that the cost of removing the tree house from public space and re-constructing a similar structure wholly within their property boundary at $5,000. As a result, Plaintiffs' current financial exposure is estimated at $7,000, although this figure may increase if DDOT decides to re-issue any of the NOVs that have been dismissed.

107.    Pursuant to 18 U.S.C. § 1030(g), a person may maintain a civil action for economic damages resulting from a violation of 18 U.S.C. § 1030(a)(5)(B), if the sum of such damages is at least $5,000 during any one-year period. 18 U.S.C. § 1030(g) also authorizes a civil action for injunctive or other equitable relief.

## COUNT II
## VIOLATION OF FIFTH AMENDMENT PROCEUDRAL DUE PROCESS
### (as to all Defendants)

108.    Plaintiffs re-incorporate and re-allege each and every allegation contained above as if fully set forth herein

109.    The Fifth Amendment to the U.S. Constitution provides, in relevant part, that "No person shall…be deprived of life, liberty, or property, without due process of law."

110.    Plaintiff Psychas gained a property interest on November 9, 2015, when DDOT approved the issuance of a public space permit, PA #118910, authorizing the construction of Plaintiffs' tree house overhang into public space.

111.    Plaintiffs Psychas' property interest was further solidified when PA #118910 closed on November 20, 2015 without apparent incident.

112.    Following the closure of PA #118910, Defendants decided that the agency's decision to issue that permit and permit it to close had been unwise. To deprive Plaintiffs of their vested property interest, however, constitutional due process required Defendants to provide a procedure and notice thereof to Plaintiffs that the agency would be seeking to legally revoke the rights granted under PA #118910.

113.    Defendants did not provide such process or notice thereof.  Instead, Defendants

sought to strip away Plaintiffs' vested property interest by initiating sham consideration of an

application ostensibly submitted by Plaintiff Psychas for a closed construction permit "renewal,"

without ever explaining the consequences of failure to renew a closed permit when no additional

work is intended.  Defendants had full knowledge that Plaintiffs had no objective desire or

reason to do more work construction work on the completed children's tree house.

114.    Defendants' underhanded scheme to provide for renewed consideration of

Plaintiffs' rights under PA #118910 facilitated the PSC's denial of a purported "renewal"

application of a closed construction permit.  The ruse was employed to unlawfully and

unconstitutionally deprive Plaintiffs of property under the Fifth Amendment to the U.S.

Constitution.

**COUNT III**
**VIOLATION OF FIFTH AMENDMENT DUE PROCESS – VOID FOR VAGUENESS**
**(as to all Defendants)**

115.    Plaintiffs re-incorporate and re-allege each and every allegation contained above

as if fully set forth herein.

116.    The Fifth Amendment to the U.S. Constitution provides, in relevant part, that "No

person shall…be deprived of life, liberty, or property, without due process of law."

117.    Under Fifth Amendment jurisprudence, a law is unconstitutionally vague if it

"fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

standardless that it authorizes or encourages seriously discriminatory enforcement." *See United

States v. Williams*, 553 U.S. 285, 304 (2008)

118.    Mayor's Order 2009-114, dated June 18, 2009, establishes the PSC as a public

body charged with considering and then making final determinations on the approval or denial of

applications for use of public space within the District of Columbia.  Under Mayor's Order 2009-

36

114, the PSC has not been vested with the authority to revoke a closed construction permit like PA #118910.

119.    Paragraph III.B. of Mayor's Order 2009-114 provides an exception for PSC consideration of applications for use of public space, if the application is "for temporary use of public space or minor permanent use in circumstances where it is not practicable or necessary to convene the full Committee for which the Chair may make final determinations, reporting such actions to the Committee by regular reports."

120.    DDOT's regulations under Titles 12A and 24 of the DCMR governing the issuance of permits authorizing the construction of balcony structures within public space do not explicitly require that such permits be considered by the PSC.   Neither do the regulations provide distinctions between permit applications that require PSC consideration from applications that do not require PSC consideration.

121.    Plaintiffs' experience with DDOT public space permitting was that they were not required to undergo PSC consideration prior to DDOT issuing PA #118910.   Yet Defendants later maneuvered them into assenting to retroactive PSC consideration of a spurious application for an unwanted "renewal" of Plaintiff Psychas' closed construction permit.

122.    As applied to Plaintiffs' tree house permitting efforts, Titles 12A and 24 of the DCMR and Mayor's Order 2009-114 are unconstitutionally vague.   The vagueness leaves the administrative process susceptible to arbitrary decision-making as to the exact circumstances under which PSC consideration is required prior to the issuance of a permit for construction involving minor permanent use of public space within the District of Columbia.   With the absence of transparent standards or rules that can be objectively applied to govern DDOT decision-making in requiring PSC review of permit applications, coupled with Plaintiffs' lack of experience with public space permitting processes, Plaintiffs were vulnerable to the abusive and

37

illegal permit revocation practice Defendants elected to employ.  Defendants utilized these

practices once the agency had come under pressure from narrow special interests in the Capitol

Hill neighborhood of Washington DC to rescind the rights conferred by permit PA #118910.

### COUNT IV
### VIOLATION OF FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS
### (as to all Defendants)

123.    Plaintiffs re-incorporate and re-allege each and every allegation contained above

as if fully set forth herein.

124.    The Fifth Amendment to the U.S. Constitution provides, in relevant part, that "No

person shall…be deprived of life, liberty, or property, without due process of law."

125.    Under Fifth Amendment jurisprudence, while land use is subject to reasonable

regulation, substantive due process protects private citizens from arbitrary government action to

deprive them of life, liberty, or property. *Elkins v. District of Columbia*, 527 F.Supp.2d 36, 47

(D.D.C., 2007) *citing County of Sacramento v. Lewis*, 523 U.S. 833 845 (1998).

126.    No regulatory provision can be found within Titles 12A and 24 of the DCMR

specifically addressing the construction of children's tree houses or play forts on private property

in the District of Columbia.  By contrast, the zoning ordinances applicable to some of the city's

suburban cities and towns include specific tree house-construction rules.[2]

127.    In the absence of any rules or regulations addressing construction of tree houses

or play forts on private property in the District of Columbia., Plaintiff Psychas sought guidance

from DDOT regarding the legal necessity to obtain a public space permit prior to building the

tree house.  Throughout this process, Plaintiffs acted in the belief that the government officials

---

[2] Public guidance summarizing the requirements applicable to jurisdictions within Fairfax
County, VA can be found at https://www.fairfaxcounty.gov/planning-zoning/zoning/residential-
setback-requirements.

.

they dealt with were faithfully executing their duty to meet their requests for permitting advice in a fair, honest, transparent and competent manner.

128.    Plaintiffs commenced their construction project in good faith reliance on the initial guidance received in July 2015, reasonably leading them to believe that no public space permit had to be issued by DDOT to authorize the small tree house overhang into public space over the tree box adjacent to their lot.

129.    Plaintiffs were then told by DDOT on November 5, 2015 to obtain a public space construction permit to rectify a Stop Work Order issued on October 26, 2015.  Plaintiffs acted on DDOT's directive expediently, securing the authorization within just five calendar days of having been advised on how to get it, even though it has never been clear whether the issuance of a permit in this instance was truly a legal necessity.

130.    After DDOT issued Permit #118910 to Plaintiff Psychas, Plaintiffs believed that the permitting issues relating to their family's tree house had been conclusively put to rest.  Had DDOT decided against issuing the permit, Plaintiffs would have been disappointed but would have been ready to accept the city's decision.   At that time, Plaintiffs' family and community had much less of an emotional attachment to the whimsical play fort in an old elm tree.

131.    Following the closure of PA #118910, however, DDOT had a change of heart.  Under political pressure, the agency came to regard the issuance of PA #118910 as a mistake.  In catering to the desire of narrow special interests seeking to destroy the tree house, Defendants then employed deception.  Defendants skillfully and unlawfully maneuvered Plaintiffs into partaking in an illegitimately conceived scheme to allow for PSC consideration of their closed construction permit, justified as a purported application for a required permit "renewal."  All this time, Defendant Stokes was repeatedly making assurances to Plaintiff Psychas that PSC review

would be "just a formality" to win her cooperation in jeopardizing a closed public space construction permit.

132.   Following the PSC's denial of the "renewal" permit application, the agency could not or would not give any immediate definitive guidance to Plaintiffs on whether or not the agency truly expected Plaintiffs to remove the tree house from public space. Had the agency or the PSC given such direction in a clear and concise manner instead of the backdated letter of January 28, 2016, Plaintiffs would have had less reason to litigate the matter at OAH.

133.   After DDOT definitively decided to pursue enforcement action in November 2016, the agency carried out enforcement efforts in a demonstrably incompetent manner. The agency has issued approximately eight (8) NOVs that misidentified Plaintiff Yee's legal name. Ultimately, Plaintiff Yee obtained actual receipt of only four (4) NOVs relating to the tree house's use of public space. Indeed, inspection and enforcement officials at DDOT did not realize their mistake until November 29, 2017, more than a year after the agency had decided to commence enforcement efforts. Due to the agency's fundamental failure to execute basic, universal requirements on effectuating service of process properly, perhaps only one NOV remains outstanding.

134.   As the aforementioned events illustrate, Plaintiffs have been made to twist and turn on the tree house matter for over two years, at the whim of Defendants. Plaintiffs have been subjected to this maltreatment despite their good faith and full cooperation initially on permitting of the tree house. Rather than responding in kind to Plaintiffs' good faith, the agency employed deception in depriving Plaintiffs of their property interest – their authority under PA #118910 to maintain in public space the tree house they had built for their children. Under the totality of the circumstances, Defendants have not acted with clean hands and have not faithfully executed their duty to act on the tree house permitting matter in a fair, transparent, impartial and competent

manner.  DDOT's actions were so outrageous and gravely unfair as to shock the conscience.  *See*

*Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C.Cir.1988).

## COUNT V
### DECLARATORY RELIEF – CONTINUING VALIDITY OF PA #118910
### (as to Defendant DDOT)

135.    Plaintiffs re-incorporate and re-allege each and every allegation contained above

as if fully set forth herein.

136.    Pursuant to 28 U.S.C. § 2201, this court may issue a declaratory judgment.

137.    Plaintiffs' position on the status of PA #118910 is that it authorized Plaintiffs to

undertake permanent construction of their children's tree house to include a small protrusion into

public space overhanging a public-private tree house during November 10-20, 2015.  Plaintiffs

concede that no tree house construction may occur within public space following the expiration

of PA #118910 on November 20, 2015, unless they obtain a new public space construction

permit.  However, once Plaintiffs were given authorization for construction during November

10-20, 2015, they were then authorized to maintain the completed structure as it existed as of the

closure of PA #118910 on November 20, 2015.

138.    Logic dictates that a sturdy, well-crafted backyard play fort which cost at least

$2,000 to build and decorate is designed to be used over a term much longer than ten (10) days.

A public space construction permit is obviously not a city authorization in the same category as

permit that is clearly temporary in nature, e.g. for parking or street festivals.

139.    In seeking to assess civil fines against Plaintiff Yee, DDOT has indicated in its

filings with OAH that PA #118910 "has since expired and has not been renewed."  Plaintiffs

anticipate that DDOT is preparing to contend that the PSC's review of the "renewal" application

under PA #121865 effectively revoked PA #118910.  Alternatively, DDOT may argue that PA

#118910 was merely a permit for temporary occupancy of public space which only authorized

the tree house's presence in public space during a ten (10)-day duration, from November 10-20, 2015.

140.    Assuming that DDOT's position is the PSC's action on PA #121865 effectively revoked PA #118910, Plaintiffs further position is that the PSC's action is legally immaterial because the revocation of a closed permit cannot invalidate any construction that occurred before the permit's closure.

141.    There exists an actual controversy of a justiciable nature between Plaintiffs and Defendants that is within the jurisdiction of this court, involving the rights and liabilities of the parties.

142.    A declaratory judgment by this Court would terminate this controversy.

## COUNT VI
## DECLATORY RELIEF – BEAUTIFICATION OF TREE SPACE
### (as to Defendant DDOT)

143.    Plaintiffs re-incorporate and re-allege each and every allegation contained above as if fully set forth herein.

144.    Pursuant to 28 U.S.C. § 2201, this court may issue a declaratory judgment.

145.    At the relevant point in time during which the tree house was built and completed (August – September, 2015), 24 DCMR § 109.3 categorically stated that: "beautification of tree spaces shall not require a permit." Since that time, however, the rule has been amended to state that a permit is required for beautification of tree space involving "the installation of any structure." *See* 64 D.C. Reg. 800.

146.    As the revision to the regulation occurred after the tree house was completed, the tree house is grandfathered under the prior iteration of 24 DCMR § 109.3 providing for a categorical permit exclusion.

147.     Accordingly, Plaintiffs' position on their tree house's protrusion into public space is that by the plain application of 24 DCMR § 109.3, they were not required to obtain a public space permit.  Nonetheless, they applied for, and secured, PA #118910 as directed by DDOT as a demonstration of good faith to the agency.

148.     In July 2015, lower-level employees of DDOT expressed a view that is consistent with Plaintiffs' current position.  They indicated that Plaintiffs' proposed tree house did not require a public space permit.  Mr. Henry disagreed with this position and advised Plaintiffs instead to obtain a permanent construction authorization, which they did efficiently with his support and that of Defendant Stokes.  It is apparent from the agency's recent enforcement actions, by issuing a series of NOVs alleging violations of 24 DCMR § 2001.2, that DDOT no longer agrees with the positions articulated by the lower-level employees on the application of 24 DCMR § 109.3 to Plaintiffs' construction of the tree house.

149.     There exists an actual controversy of a justiciable nature between Plaintiffs and Defendants that is within the jurisdiction of this court, involving the rights and liabilities of the parties.

150.     A declaratory judgment by this Court would terminate this controversy.

## COUNT VII
## VIOLATION OF 42 U.S.C. § 1983
### (as to Defendants Marcou and Stokes in their official and personal capacity)

151.     Plaintiffs re-incorporate and re-allege each and every allegation contained above as if fully set forth herein.

152.     As an administrative agency of the District of Columbia government, Defendant DDOT owed a duty under the Fifth Amendment to the U.S. Constitution to carry out the agency's consideration of issues relating permitting of the tree house in a fair and impartial manner.

153.    Employees of the agency, including Defendants Marcou and Stokes, were also bound to respect any rights already conferred upon Plaintiffs under PA #118910, despite Defendant Marcou's apparent unhappiness at the decision of subordinates to facilitate the issuance of a public space construction permit to Plaintiff Psychas, and to allow the permit to close.

154.    Rather than respecting Plaintiffs' right to due process under the law, Defendants Stokes and Marcou ran roughshod over them.  Defendants Marcou and Stokes willfully manipulated the agency's processes for public space permit consideration to allow for consideration of a purported application for permit "renewal," when no such application was ever desired or requested by Plaintiffs.  Defendant Stokes also actively deceived Plaintiffs to lure them into participating in a bogus PSC proceeding in which "denial" of a superfluous permit was a foregone conclusion.

155.    To execute this scheme, Defendant Stokes, under Defendant Marcou's supervision, knowingly and intentionally hacked Plaintiff Psychas' TOPS account in violation of the Computer Fraud and Abuse Act to perform an action (i.e. the submission of an application for permit "renewal") without having gained Plaintiff Psychas' permission to do so.  As DDOT's City-Wide Permitting Manager, a senior agency official, he knew, or should have known, that his act was unlawful.

156.    In unlawfully accessing and altering information within Plaintiff Psychas' TOPS account, Defendant Stokes also violated Plaintiff Psychas' personal privacy.

157.    The actions of Defendants Stokes and Marcou were all undertaken under color of state law.

158.    As a direct and proximate consequence of Defendants Stokes' and Marcou's unlawful actions, Plaintiff Psychas' property right – her authorization under PA #118910 to keep

and maintain the tree house that Plaintiffs built for their children – has been unconstitutionally deprived.

159.     As a direct and proximate consequence of Defendant Stokes' and Defendant Marcou's unlawful actions, Plaintiff Yee is currently under threat of civil fine assessments and an order of "abatement" (i.e. destruction) from OAH.

160.     As a direct and proximate consequence of Defendant Stokes' invasion of Plaintiff Psychas' privacy and unauthorized access to her personal information residing in her TOPS account, Plaintiff Psychas has suffered injury in the form of emotional distress.

**COUNT VIII**
**VIOLATION OF 42 U.S.C. § 1983**
**(as to Defendant DDOT)**

161.     Plaintiffs re-incorporate and re-allege each and every allegation contained above as if fully set forth herein.

162.     As an administrative agency of the District of Columbia government, Defendant DDOT owed a duty under the Fifth Amendment to the U.S. Constitution to carry out the agency's consideration of issues relating permitting of the tree house in a fair and impartial manner.

163.     Defendants Marcou and Stokes, who are employees of Defendant DDOT, willfully manipulated the agency's processes for public space permit consideration to allow for consideration of a purported application for permit "renewal," when, clearly, no such application was ever desired or requested by Plaintiffs.  Defendant Stokes also actively deceived Plaintiffs to lure them into participating in the PSC's sham permit application review proceeding.  To this end, he hacked into Plaintiff Psychas' TOPS account in violation of 18 U.S.C. § 1030.

164.     Upon belief and information, the ploy that Defendants Marcou and Stokes executed was not invented by them.  Rather, DDOT proverbially keeps this trick in its back

pocket, to be used on those occasions when the agency has come under intense political pressure to reverse a controversial permitting decision, or otherwise comes to the belated realization that a decision to issue a permit was unwise.

165.    Upon belief and information, novices in the permitting process and ordinary home owners, such as Plaintiffs, are nearly always the victims of DDOT's pattern and practice of employing the "renewal" shortcut to revoke and undermine a previously issued permit.  DDOT recognizes that the risks associated with foisting this trick upon seasoned real estate professionals and commercial entities are too great.

166.    As a direct and proximate consequence of the tried and true procedure that Defendant DDOT employed against Plaintiffs, their property right – Plaintiff Psychas' authorization under PA #118910 to keep and maintain the tree house that Plaintiffs built for their children – has been unconstitutionally deprived.

## PRAYER FOR RELIEF

I.    Wherefore, Plaintiffs pray for relief and judgment in their favor against Defendant DDOT, as follows:

a.   Compensatory damages pursuant to 18 U.S.C. § 1030(g) and 42 U.S.C. § 1983;

b.   Damages for emotional distress, pursuant to 42 U.S.C. § 1983;

c.   Punitive damages pursuant to 42 U.S.C. § 1983;

d.   Injunctive relief vacating the Public Space Committee's denial of Plaintiffs' application for public space permit "renewal" under PA #121865 on January 28, 2016;

e.   Injunctive relief prohibiting Defendant DDOT from asserting in any civil fine proceeding that the occupation of public space by the children's tree house is not authorized by a valid public space permit;

f.  Injunctive relief prohibiting Defendant DDOT from asserting before any District of Columbia agency, court, or other governmental body that the children's tree house, as currently constituted, requires any additional authorization pursuant to a public space permit;

g.  Declaratory relief to conclusively establish that the children's tree house, as currently constituted, is and continues to be authorized under DDOT permit PA #118910;

h.  Declaratory relief to conclusively establish that 24 DCMR § 109.3, as promulgated as of October 26, 2015, authorized Plaintiffs to build and maintain their children's tree house even in the absence of a public space permit.

i.  Costs;

j.  Attorney's Fees;

k.  Such other relief as the court determines to be appropriate under the circumstances.

II.  Wherefore, Plaintiffs pray for relief and judgment in their favor against Defendants Stokes and Marcou, jointly and severally in their official and personal capacity, as follows:

a.  Economic damages pursuant to 18 U.S.C. § 1030(g) and 42 U.S.C. § 1983;

b.  Damages for emotional distress pursuant to 42 U.S.C. § 1983;

c.  Punitive damages pursuant to 42 U.S.C. § 1983;

d.  Costs;

e.  Attorney's Fees; and

f.  Such other relief as the court determines to be appropriate under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury in all counts described in this Complaint.

Respectfully submitted,

E. Psychas

Ellen Psychas, *pro se*
516 Archibald Walk, S.E.
Washington, DC 20003
(202)-262-7005
epsych@hotmail.com

Bonding Yee, *pro se*
516 Archibald Walk, S.E.
Washington, DC 20003
(917)-536-2774
byeecanon@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Complaint will be served as soon as the clerk of this court has signed, sealed, and issued the Summons to accompany this Complaint, and that the Summons and Complaint will be served by certified mail and/or personal service, in accordance with Rule 4 of the Federal Rules of Civil Procedure, upon the following Defendants:

DISTRICT DEPARTMENT OF TRANSPORTATION
55 M St., S.E.
Washington, D.C. 20003
(202)-673-6813

MATTHEW MARCOU
55 M St., S.E.
Washington, D.C. 20003
(202)-673-6813

JOHN STOKES
1100 4th St., S.W.
Washington, D.C. 20024
(202)-442-8354

I further certify that once service has been effectuated upon Defendants, I shall provide proof of service in accordance with Rule 4(j).

Bonding Yee