# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
ELLEN PSYCHAS, *et al.*,                    )
                                            )
                    Plaintiffs,             )
                                            )
        v.                                  )        Civil Action No. 18-0081 (ABJ)
                                            )
DISTRICT DEPARTMENT                         )
OF TRANSPORTATION, *et al.*,                )
                                            )
                    Defendants.             )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiffs, Ellen Psychas and Bonding Yee, residents of the District of Columbia, have brought this lawsuit against the District of Columbia Department of Transportation ("DDOT") and two employees of DDOT, Matthew Marcou and John Stokes, claiming violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Due Process Clause of the Fifth Amendment.  Am. Compl. [Dkt. # 16].  This lawsuit arises out of plaintiffs' construction of a tree house on their property for their two daughters in 2015.  *Id.*  Plaintiffs claim that in the course of obtaining the necessary permits from the District of Columbia, plaintiffs were provided with incorrect information, and they complain that they were issued a valid permit only to have it constructively revoked later through improper procedures.  Plaintiffs seek injunctive relief vacating the denial of their permit application and prohibiting DDOT from levying any fines related to the tree house.  *Id.* at 51, Prayer for Relief.  They also seek declarations pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the tree house is authorized by permit and by D.C. regulations.  Am. Compl. ¶¶ 146–60.  Finally, they request compensatory damages for the emotional distress, reputational harm, and inconvenience they allegedly suffered.  *Id.*

On June 15, 2018, defendants moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot. to Dismiss [Dkt. # 18] ("Defs.' Mot.").  Plaintiffs opposed the motion on July 23, Pls.' Opp. to Defs.' Mot. [Dkt. # 21] ("Pls.' Opp."), and defendants replied on August 3.  Defs.' Reply to Pls.' Opp. [Dkt. # 23] ("Defs.' Reply").  On August 13, the Court granted leave to allow plaintiffs to file a sur-reply.  Pls.' Sur-Reply in Supp. of Pls.' Opp. [Dkt. # 25] ("Pls.' Sur-Reply").

Because plaintiffs have failed to state a claim under the CFAA or the Due Process Clause of the Fifth Amendment, the Court lacks authority to award relief under 42 U.S.C. § 1983 or the Declaratory Judgment Act.  Therefore, defendants' motion to dismiss will be granted.

## BACKGROUND

The plaintiffs in this lawsuit are Ellen Psychas and her spouse Bonding Yee.  They own a home in Southeast, Washington, D.C., and in July 2015, they decided to build a tree house on the elm tree located on their property for their two daughters.  Am. Compl. ¶ 25.  Before commencing construction, Psychas called the D.C. Department of Consumer & Regulatory Affairs ("DCRA") and DDOT to ask whether a permit was necessary.  *Id.* ¶ 28.  The plan for the tree house showed that it would hang over public space, an alleyway, adjacent to the house.  *Id.* ¶ 27.  The complaint alleges that in conversations with city employees, either through the permitting hotline or in person, Psychas was informed that she would not need a permit for the tree house.  *Id.* ¶¶ 29–30.  DCRA officials informed her that the tree house was smaller than projects that typically require permits, and that her proposed work did not violate the District's "tree space rules."  *Id.*  DDOT employees also informed her that there was no mechanism for DDOT to issue a permit to cover a small tree house that hangs over public space.  *Id.* ¶ 31.

In August 2015, plaintiffs commenced construction, and the tree house was completed five weeks later in September.  Am. Compl. ¶¶ 26, 33.  To ensure that they constructed the tree house

in an environmentally friendly manner, the couple hired a private arborist recommended by the DDOT Urban Forestry Administration. *Id.* ¶ 26. Approximately two-thirds of the tree house's platform hangs over plaintiffs' private property, while the remaining third hangs over the public space adjacent to their home. *Id.* ¶ 27.

In October 2015, a month after construction was completed, one of plaintiffs' neighbors complained about the tree house to city officials and demanded to know why the proper permits were not obtained. Am. Compl. ¶ 33. In response to the complaint, DDOT conducted an inspection of the structure on October 26, 2015, and the inspector issued a Stop Work Order ("SWO") that directed that the structure be removed until the proper permits were obtained. *Id.* ¶ 34. At a follow up inspection on November 4, 2015, two inspectors advised Psychas to apply for a public space permit to cover the portion of the tree house that hung over the public alleyway. *Id.* ¶ 36. One of the inspectors, James Henry, informed Psychas that she may also need a construction permit, *id.* ¶ 37, and that she should contact John Stokes at the DDOT and Gary Englebert at the DCRA to ensure that she received the correct information regarding the permits required. *Id.* ¶¶ 38–39. In addition, he advised her to submit the project's documents to the Advisory Neighborhood Commission ("ANC"), *id.* ¶ 40, a neighborhood body composed of locally elected representatives that acts as a voice on matters affecting the neighborhood. Psychas complied with all of these directives. *Id.* ¶ 41.

On November 6, 2015, Psychas visited the DDOT permitting center and met with the city-wide permitting manager at DDOT, John Stokes. Am. Compl. ¶ 42. Stokes reviewed the project plan documents and informed Psychas that he thought the appropriate construction category for the part of the tree house that hung over public space was a "balcony projection." *Id.* ¶ 44. During the meeting, he had Psychas submit a permit application online on a public computer through

DDOT's Transportation Online Permitting System ("TOPS"). *Id.* ¶ 45. Stokes then informed Psychas that her permit would be open for ten days "before closing." *Id.* ¶ 46. Psychas asked Stokes why the permit would close after only ten days, and Stokes responded that he had been made aware of the complaints about the tree house, and "[h]aving the permit close after just ten . . . days . . . would ensure that the tree house permitting matter would be put to rest quickly." *Id.* Psychas also asked Stokes whether she must take other steps to ensure that the "permit would close correctly," but Stokes told her no additional steps were necessary; she would only need to display the permit on the tree house and in a first-floor window of their house. *Id.* ¶ 47. He also allegedly advised Psychas that "any additional construction work on the children's tree house that she may undertake be completed during the ten . . . days before the permit closed." *Id.* Plaintiffs allege that Stokes did not inform them that the permit was merely temporary or that they would need approval by the Public Space Committee ("PSC"), a body that is charged with reviewing and deciding public space permit applications. *Id.* ¶¶ 48–49. On November 9, DDOT approved a permit with the effective dates of November 9 through November 20, 2015. *Id.* ¶¶ 50–51; Ex. E to Compl. [Dkt. # 1-1] ("Nov. 2015 Permit") at 15–18; Ex. D. to Compl. [Dkt. # 1-1] ("Permit Description") at 12–13.[1] The permit indicated that PSC consideration was unnecessary. *See* Nov. 2015 Permit.

In mid-November, the same neighbor again complained about the tree house and raised issues with the permit issued by DDOT, Am. Compl. ¶ 53, and on December 9, 2015, Stokes called

---

[1] At the Rule 12(b)(6) stage, a Court can review "documents attached as exhibits or incorporated by reference in the complaint," or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F.Supp.2d 117, 119 (D.D.C. 2011) (citations omitted); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.").

Psychas to inform her that the ANC and PSC would need to review plaintiffs' project. *Id.* ¶ 54. The ANC held meetings on January 7 and 12, 2016, and plaintiff Yee attended both to offer written and oral testimony in support of the tree house. *Id.* ¶ 56. At the January 12 meeting, the ANC voted to oppose the permit application. *Id.* The ANC's decision is merely advisory and does not bind the city. *Id.* ¶ 58. At the ANC meetings, plaintiffs learned that the PSC had scheduled a meeting on January 28, although they "never received any official written notice from DDOT or the PSC describing the scope and nature of the PSC's forthcoming review." *Id.* ¶ 59.

Plaintiffs allege that on January 15, 2016, the D.C. permitting manager John Stokes "entered into his official TOPS account" to access Psychas's TOPS account to submit a renewal application for the permit. Am. Compl. ¶¶ 61, 104. Stokes informed Psychas that he needed to access her account "to create an active permit application for the tree house prior to the 1/28 meeting so that comments [on the application] could be uploaded prior to the meeting." *Id*. ¶¶ 61, 65. Instead of resubmitting the permit application Psychas had prepared in November 2015, Stokes created a new application and submitted it on Psychas's behalf. *Id.* ¶ 62. He emailed her later that day explaining what he had done. *Id*. ¶ 61. Psychas maintains that she did not give Stokes permission to access her account or to submit a new application in her name, and that she had only "agreed to submit an application for the original public space permit to serve as a *post hoc* ratification of the already built structure." *Id.* ¶¶ 63–64.

On January 28, 2016, the PSC denied the renewed permit application. Am. Compl. ¶ 71. After the meeting, plaintiffs asked Stokes to explain the status of the November 2015 permit, and he replied that he did not know. *Id*. ¶ 72. He warned them that they would likely receive a civil fine notice for the tree house's continued occupation of public space, as a result of the PSC's denial. *Id.*

During February 2016, plaintiffs sought clarification of the status of the November 2015 permit, but their inquiries went unanswered.  Am. Compl. ¶¶ 74–76.  Therefore, on February 23, 2016, plaintiffs filed two complaints with the Office of Administrative Hearings ("OAH") concerning the Stop Work Order ("SWO") issued in October 2015 and the PSC's denial of the renewed permit application.  *Id.* ¶ 76.  During settlement negotiations between city officials and plaintiffs, James Henry, one of the original inspectors of the tree house, indicated that he thought the November 2015 permit had not been revoked, and city officials agreed that DDOT would not take any enforcement action against the tree house until November 2016.  *Id.* ¶ 78.  Settlement negotiations continued through the end of April 2016, at which time the OAH issued an Order to Show Cause why it had jurisdiction to hear plaintiffs' appeal of the PSC decision.  *Id.* ¶ 79.  OAH then dismissed the case on May 19, 2016 for lack of jurisdiction and mootness.  *Id.* ¶ 80.  Plaintiffs filed for reconsideration and appealed OAH's decision to the D.C. Court of Appeals.  *Id.*  On October 1, 2018, the Court of Appeals found that the case was moot, because the city had agreed that the SWO had no legal effect.  *See* Order, *Yee v. Dist. of Columbia Dep't of Transp.*, No. 16-AA-688 (D.C. Oct. 1, 2018) [Dkt. # 26-1] ("DCCA Order").

Between November 2016 and July 2017, plaintiffs were issued a series Notices of Violations ("NOVs") regarding the tree house, but none of them were received by plaintiffs because they were addressed to Yee in the wrong name.  Am. Compl. ¶ 85.  When Yee finally received one of the NOVs, he learned that DDOT was alleging a violation of 24 DCMR § 2001.2, which prohibits obstruction of travel in public space.  *Id.*  Three additional NOVs were issued in September and October 2017.  *Id.* ¶ 86.  Each NOV sought a fine of $2,000. *Id.* ¶ 95.  Yee contested the NOVs at the OAH, and he moved to dismiss them based upon improper service.  *Id.* ¶ 96.

DDOT also requested that the NOVs be dismissed. *Id.* By January 23, 2018, OAH had dismissed all four NOVs. *Id.*

On January 12, 2018, plaintiffs filed suit in this court against DDOT, the Associate Director of the Public Space Regulation Division, Matthew Marcou, and the City-Wide Permitting Manager, John Stokes. Compl. [Dkt. # 1]. On May 21, 2018, plaintiffs amended the complaint alleging the following claims against the three defendants:

- Count 1: A violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, based on Stokes's actions in accessing Psychas's TOPS account without permission, changing her password, and submitting a renewal application on her behalf;

- Count 2: A violation of the Fifth Amendment's guarantee of procedural due process, based upon the constructive revocation of the November 2015 permit;

- Count 3: A violation of the due process clause based upon the vagueness of Titles 12A and 24 of the D.C. Municipal Regulations ("DCMR"), and the Mayor's Order 2009-114;

- Count 4: A violation of substantive due process;

- Count 5: Requesting a declaratory judgment affirming the validity of the November 2015 permit;

- Count 6: Requesting a declaratory judgment affirming the lawfulness of the tree house under 24 DCMR § 109.3 as it existed in 2015;

- Count 7: A violation of 42 U.S.C. § 1983 against defendants Marcou and Stokes (Count 7); and

- Count 8: A violation of 42 U.S.C. § 1983 against the District of Columbia.

Am. Compl. ¶¶ 99–180. Plaintiffs also request injunctive relief vacating the January 28, 2016 PSC denial of the renewed permit application and prohibiting DDOT from levying any future fines on plaintiffs for their tree house. *Id.* at 51, Prayer for Relief.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the court need not accept inferences drawn by

the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

### I. Plaintiffs' claims are ripe.

Defendants move to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). They argue that plaintiffs' claims are not ripe because they allege harm contingent upon future DDOT actions. Defs.' Mem. at 8.

The Court agrees if a plaintiff's claims are not ripe, it may not exercise jurisdiction over the case. *See Exxon Mobil Corp. v. FERC*, 501 F.3d 204, 208 (D.C. Cir. 2007) ("[R]ipeness goes to subject matter jurisdiction."). Defendants are correct that "[a] claim is not ripe for adjudication if it rests upon continent future events that may not occur as anticipated, or indeed may not occur at all." *Nevada v. DOE*, 457 F.3d 78, 85 (D.C. Cir. 2006). But here, the claims do not rest upon future events. Plaintiffs' computer fraud claim rests upon an alleged unauthorized use that occurred in 2016. Am. Compl. ¶¶ 61–64. Plaintiffs' due process claims center around the constructive revocation of the permit in 2015 and 2016. *Id.* ¶¶ 116–45. Plaintiffs do not seek compensatory damages to cover civil fines that have not been levied against them yet; rather, they seek equitable relief regarding the status of the permit and compensatory damages in the form emotional distress, reputational harm, and inconvenience they have already suffered. *Id.* at Prayer for Relief.

Thus, the Court has jurisdiction over the claims, and it will not dismiss the case pursuant to Rule 12(b)(1).

## II. Plaintiffs have failed to state a claim under the Computer Fraud and Abuse Act.

### A. Plaintiffs have sufficiently pled that Stokes exceeded his authorized access.

Plaintiffs allege that when defendant Stokes accessed Psychas's personal account within Transportation Online Permitting System ("TOPS"), changed her password, and submitted a renewal application for a public space permit on her behalf, defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, in a number of ways. Specifically, plaintiffs assert:

- "As of January 15, 2016, Plaintiff Psychas had not authorized anyone else to have access to her TOPS account." Am. Compl. ¶ 102.

- "Defendant Stokes also had an account within TOPS. The purpose of this account was solely to enable Defendant Stokes to conduct official business, such as reviewing applications for public space permits." *Id.* ¶ 103.

- "[O]n or shortly before January 15, 2016, Defendant Stokes entered into his official TOPS account . . . to obtain Plaintiff Psychas'[s] TOPS account username." *Id.* ¶ 104. Plaintiff claims that this is a violation of 18 U.S.C. § 1030(a)(2)(C).

- "After Defendant Stokes learned the username of Plaintiff Psychas'[s] TOPS account, he and/or his colleagues caused the account's password to be changed to a default password ("Password1"). . . . Defendants effectuated Plaintiff Psychas'[s] password to be changed through Defendant Stokes' official TOPS account and/or a different computer associated with TOPS." *Id.* ¶ 105. Plaintiff claims that this was a violation of § 1030(a)(5)(A).

- When he changed her password, "[d]efendants impaired the availability of information in TOPS to Plaintiff Psychas. . . . Accordingly, [d]efendants' unauthorized acts to change [her] . . . password recklessly and intentionally caused damage without authorization to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A) & (B)." *Id.* ¶ 106. Because plaintiffs allege they suffered loss from the violation, they claim a violation of § 1030(a)(5)(C) as well. *Id.* ¶ 107.

- "After gaining access, Defendant Stokes submitted an application for a public space permit 'renewal' on her behalf without her permission." *Id.* ¶ 108.

- All of this was done "knowingly and with intent to defraud" to "obtain[] a thing of value" in violation of § 1030(a)(4). *Id.* ¶ 110.

Plaintiffs claim that defendants violated five provisions of the CFAA: § 1030(a)(2)(C), § 1030(a)(4), and § 1030(a)(5)(A), (B), and (C). Section 1030(a)(2)(C) of the CFAA states:

> Whoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer[2] . . . shall be punished as provided in subsection (c) of this section.

Section 1030(a)(4) states:

> Whoever . . . knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.

---

2 A "protected computer" is defined as a computer –

> (A) exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government; or

> (B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;

§ 1030(e)(2). This broad definition encompasses "effectively all computers with internet access." *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012) (en banc); *see also United States v. Yücel*, 97 F. Supp. 3d 413, 418–19 (S.D.N.Y. 2015) (collecting cases and noting "widespread agreement in the case law on the meaning of 'protected computer'"); *Human Touch DC, Inc. v. Merriweather*, No. 15-741, 2015 WL 12564166, at *4 (D.D.C. May 26, 2015) (holding that "the computer from which [the defendant] obtained the information at issue was 'protected'" because it "was connected to the internet").

And finally, § 1030(a)(5)(A)–(C) state:

> Whoever . . .
>
> (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; or
>
> (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
>
> (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

What all these provisions have in common is that a violation takes place only if a person "exceeds authorized access" or accesses a computer "without authorization."

Defendants maintain that the CFAA claims are deficient for three reasons. First, they argue that defendant Stokes did not "exceed authorized access" to a protected computer, or access a "protected computer" "without authorization," because the TOPS system is not a "computer," and Stokes was authorized by his employment to access it in any event. Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. [Dkt. # 18-1] ("Defs.' Mem.") at 13–14. Second, they argue that plaintiffs have failed to sufficiently plead "damage," a required element of § 1030(a)(5)(A) and (B). Finally, defendants argue that plaintiff has failed to sufficiently plead "loss," which is required to maintain a civil suit under the Act. *Id.* at 15–16.

The first argument has two prongs: whether the TOPS system can be characterized as a "computer," and whether Stokes had authorization to access it.

With respect to Stokes's authority, courts have noted that the meaning of "without authorization" is "fairly straightforward." *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 193–94 (D.D.C. 2017). "[A] person who 'intentionally accesses a computer without authorization' accesses a computer without any permission at all." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1128 (9th Cir. 2009) ("[A]n employer gives an employee 'authorization' to access

a company computer when the employer gives the employee permission to use it."); *Lewis-Burke Assocs., LLC v. Widder*, 725 F. Supp. 2d 187, 192–93 (D.D.C. 2010) (citing *Brekka* for the proposition that "without authorization" depends on whether "an employer gives an employee permission to use a company computer" and even if the employer puts certain restrictions on the use of that computer, the employee remains authorized to use the computer).

Plaintiffs assert that the online permitting platform "is a protected computer," Am. Compl. ¶ 101, but the online application or program does not fall within the CFAA's definition of a computer:

> an electronic, magnetic, optical, electrochemical, or other high speed *data processing device* performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.

18 U.S.C. § 1030(e)(1) (emphasis added). Thus, a "computer" under the statute is not its software or an application available over the internet. Rather, it is the device itself. While plaintiffs maintain that Stokes did not have authorization to access Psychas's account, they do not allege that he used the DDOT computer, or any other computer, without permission. In fact, they make no allegations regarding the permission he had to access the computer he used to access plaintiff's account in TOPS. Thus, plaintiffs have failed to allege that defendant Stokes accessed a computer "without authorization" and those portions of Count 1 based on "accessing a protected computer without authorization" in § 1030(a)(2)(c), § 1030(a)(5)(A), (B), and (C) must all be dismissed. *See Hedgeye*, 271 F. Supp. 3d at 193. (finding the "without authorization" prong to be inapplicable and that plaintiffs failed to state a claim where the complaint asserted that defendant accessed particular files to which he did not have authorized access).

The more complicated question, though, is whether plaintiffs have sufficiently pled that Stokes exceeded his authorization to use the computer for purposes of those same sections when they allege that he accessed plaintiff Psychas's account and altered information.

The CFAA defines "exceeds authorized access" as follows: "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). Therefore, to survive the motion to dismiss, plaintiffs must have alleged facts to support an inference that Stokes was not "entitled" to access plaintiff's account, and/or that he "obtain[ed] or alter[ed] information" that he was not entitled to receive or change. *Brekka*, 581 F.3d at 1133.

Plaintiffs state in their complaint that Stokes is an employee of the District of Columbia Department of Transportation – he was, "[a]t all relevant times" the "City-Wide Permitting Manager." Am. Compl. ¶ 23. TOPS is a DDOT maintained platform, *id*. ¶ 1, through which D.C. residents can submit permit applications. *Id*. ¶ 103. The complaint alleges that Stokes had an "official" account within TOPS, the purpose of which is "solely to enable Defendant Stokes to conduct official business, such as reviewing applications for public space permits." *Id.*

Plaintiffs repeatedly assert that Psychas never gave Stokes permission to access her account. Am. Compl. ¶ 102 ("Psychas had not authorized anyone else to have access to her TOPS account."); *id.* ¶ 108 ("By Defendant Stokes' actions in submitting this application on Plaintiff Psychas'[s] behalf without her authorization, Defendants violated 18 U.S.C. § 1030(a)(5)(B)."). But it is important to note that the complaint is not about hacking into a personal private account on a server unrelated to the District; the account at issue was established on the DDOT server, in a program that does nothing but supports DDOT's permitting function. The complaint does not allege or set forth facts to support an inference that Stokes exceeded his authorization to use a

DDOT computer when he accessed the information in Pyschas's account on the DDOT system, or that, as the permitting manager at DDOT, he was not authorized to use his official account to review individual user accounts on the system. As plaintiffs put it, Stokes "*entered into his official TOPS account . . .* to obtain Plaintiff Psychas'[s] TOPS account username." *Id.* ¶ 104.

While the complaint does not support the conclusory allegation that Stokes was not permitted to access the information in the account at all, plaintiffs also allege that Stokes made "unauthorized changes" when he changed Psychas's password and submitted a renewal application on her behalf without her permission. Plaintiffs allege that Stokes did not have the authority to alter information in a private TOPS user account. *Id.* ¶¶ 105–09.

For the purposes of 12(b)(6), giving plaintiffs the benefit of all inferences, and considering the leniency the Court affords to *pro se* plaintiffs, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Court will proceed on the assumption that plaintiffs have alleged enough facts to support an inference that Stokes exceeded his authorized access when he altered the information within her private account. But while plaintiffs may have plausibly alleged that Stokes exceeded his authorized access, plaintiffs' claim still falls short because they have failed to allege the "loss" that is required to sustain a civil action under the CFAA.

### B. Plaintiffs have failed to allege loss.

The provision authorizing civil suits under the CFAA states:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

18 U.S.C. § 1030(g). Subsection (c)(4)(A)(i) provides that a complainant must have suffered:

(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(III) physical injury to any person;

(IV) a threat to public health or safety;

(V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

(VI) damage affecting 10 or more protected computers during any 1-year period; or

18 U.S.C.A. § 1030(c)(4)(A)(i). Thus, to maintain a civil action under § 1030, plaintiff must allege facts to show that as a result of defendants' violation, they suffered one of the types of "damage" or "loss" listed in § 1030(c)(4)(A)(i).

Damage is defined as "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8). Loss is defined by the statute to mean:

[A]ny reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

§ 1030(e)(11). The only category in § 1030(c)(4)(A)(i) that plaintiffs claim is applicable to them is category 1, which involves "loss" to one or more persons during any one-year period, aggregating at least $5,000 in value. Am. Compl. ¶ 115. In this category, only "economic damages" are compensable. § 1030(c)(4)(A)(i)(I). Because the Court finds that plaintiffs have

failed to allege "loss," it need not address defendants' arguments regarding the resultant "damages."

Plaintiffs claim that they will suffer loss because submission of the renewal application led to the withdrawal of authorization for the tree house, so they may receive future Notices of Violations ("NOVs"), which may include a fine of up to $2,000 per violation, and removing the tree house would cost approximately $5,000.  Am. Compl. ¶¶ 112–15.

This circuit has not yet interpreted what constitutes "loss" as contemplated by the CFAA. But, the circuits that have addressed this issue – the Fourth, Sixth, and Eleventh – have all found that the statutory definition encompasses:  "(1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017); *see also Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073–74 (6th Cir. 2014); *A.V v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009).  Plaintiffs' allegations fall into neither category.

Some district courts have similarly found that loss is recoverable *only* if it was due to an interruption in services or damage to computers.  *See TriTeq Lock & Sec. LLC v. Innovative Secured Solutions, LLC*, No. 10-cv-1304, 2012 WL 394229 at *6 (N.D. Ill. Feb. 1, 2012) ("[T]o permit a plaintiff to state a CFAA claim by simply alleging costs incurred in responding to an alleged offense or conducting a damage assessment without alleging that the offense caused damage would impermissibly broaden the applicability of the CFAA."); *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1371 (S.D. Fla. 2009); *Brooks v. Agate Res., Inc.*, No.

6:15-CV-00983-MK, 2019 WL 2635594 at *24 (D. Or. Mar. 25, 2019), *report and recommendation adopted*, No. 6:15-CV-000983-MK, 2019 WL 2156955 (D. Or. May 14, 2019).

It is true that a minority of district courts have noted that the statute's use of the word "including" is illustrative, rather than exhaustive, so the term "any reasonable cost" could include costs not expressly delineated in the statute. *See Fidlar Technologies v. LPS Real Estate Data Solutions*, Case No. 4:13-cv-4021-SLD-JAG, 2013 WL 5973938 at *6 (C.D. Ill. Nov. 8, 2013) ("The problem with the common interpretation of the statute . . . is that it ignores the opening clause of § 1030(e)(11), which broadly defines loss as any reasonable cost to any victim."); *Hovanec v. Miller*, No. CV SA-17-CV-766-XR, 2019 WL 3290129 at *14 n.17 (W.D. Tex. July 22, 2019), citing *Motio, Inc. v. BSP Software LLC*, No. 3:16-cv-00331, 2016 WL 9559916 at *15–*16 (N.D. Tx. May 27, 2016). Plaintiffs have asked the Court to apply this broad definition of loss, although they recognize that "they are proposing a novel application of the CFAA's civil remedies that appears to be untested." Pls.' Opp. at 30–31.

But even the case that plaintiffs rely upon for a broad definition, *Fidlar Technologies*, did not apply it, because the plaintiff there had alleged losses resulting from assessing the damage to its computers and its servers. 2013 WL 5973938 at *8. The court merely observed, in dicta, that the statute could be interpreted more broadly. *Id.* And the only case the Court could find that applied the expanded definition was from the Northern District of Texas, which is not binding on this Court, and it goes against the interpretation of loss from virtually every other district that has addressed this issue. *Motio, Inc.*, 2016 WL 9559916 at *15–*16. To the extent that this Court might agree in some other circumstance that there is some flexibility built into the statute, when one looks at the provision in question, particularly in the context of the statute as a whole and its

purpose and legislative history, it appears that these plaintiffs are asking the Court to stretch the language way too far.

As observed by a number of other courts, "there is nothing to suggest [in the CFAA] that the 'loss' or costs alleged can be unrelated to the computer." *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004) (finding that, in light of the statute as a whole and the legislative history, loss refers only to "any remedial costs of investigating the computer for damage, remedying the damage and any costs incurred because the computer cannot function while or until repairs are made" and finding that travel expenses to remedy the violation were "too far outside the scope of what the statute is to protect against"), *aff'd*, 166 F. App'x 559 (2d Cir. 2006) (finding that because the alleged loss – travel costs to attend meetings to assess the business loss associated with the misappropriated data – had no connection to computer investigation or repair, plaintiff had not alleged "loss" under the CFAA). Many courts agree that loss refers only

to the costs associated with responding to a violation or restoring the information that was damaged

or any costs incurred because of an interruption of services.[3]

The Court will apply the interpretation of loss set out in these cases, and it notes that the

legislative history of the CFAA also suggests that Congress meant "loss" to cover those costs

associated with repairs and the damage to the computer itself. *See In re DoubleClick Inc. Privacy*

*Litig.*, 154 F. Supp. 2d 497, 521 n.29 (S.D.N.Y. 2001), citing 132 Cong. Rec. S14453 (daily ed.

Oct. 1, 1986) (statement of co-sponsor Sen. Trible) ("In addition, the concept of 'loss' embodied

---

[3]     *See e.g.*, *Quintero v. Wells Fargo Bank N.A.*, No. 17-CV-03932, 2018 WL 6437548 at *3 (E.D.N.Y. Oct. 15, 2018), *report and recommendation adopted*, No. 17CV03932FBRER, 2018 WL 6421055 (E.D.N.Y. Dec. 6, 2018), quoting *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 521 (S.D.N.Y. 2001) (finding that the type of damages asserted were not "loss" as contemplated by the CFAA because they were not costs associated with their efforts to remedy the violation or costs incurred due to an interruption of services); *Synthes, Inc. v. Emerge Medical, Inc.*, 2014 WL 2616824 at *26–*27 (E.D. Pa. June 11, 2014) ("Courts have held that, to fall within this definition, the alleged "loss" must be related to the impairment or damage to a computer or computer system."); *TriTeq Lock*, 2012 WL 394229 at *6, quoting *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 721 (N.D. Ill. 2009) ("Costs not related to computer impairment or computer damages are not compensable under the CFAA."); *Lasco Foods, Inc. v. Hall and Shaw Sales, Mktg. & Consulting, LLC*, 600 F. Supp. 2d 1045, 1052 (E.D. Mo. 2009) (finding that plaintiff alleged loss where its computers were stolen and were not returned for 108 days, and it had hired investigators to assess what information was missing when they received the missing computers); *Frees Inc. v. McMillian,* Civil Action No. 05–1979, 2007 WL 2264457 at *3 (W.D. La. Aug. 6, 2007) ("Courts have consistently interpreted 'loss'. . . to mean a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted."); *Chas. S. Winner, Inc. v. Polistina*, Civ. Action. No. 06-4865 (NLH), 2007 WL 1652292 at *4 (D.N.J. June 4, 2007) ("[P]laintiffs must allege facts that the damage or loss incurred was related to investigating or remedying damage to the computer, or due to an interruption in services."); *L-3 Communications Westwood Corp. v. Robicharux*, No. 06-0279, 2007 WL 756528 at *4 (E.D. La. Mar. 8, 2007) ("The court finds that L–3's allegations of loss of trade secrets and lost profits are not contemplated by the CFAA. Losses under CFAA are compensable when they result from damage to a computer system or the inoperability of the accessed system."); *Resdev, LLC v. Lot Builders Ass'n, Inc.*, No. 6:04-CV-1374ORL31DAB, 2005 WL 1924743 at *4 (M.D. Fla. Aug. 10, 2005) (applying statutory canons of construction to conclude that loss only refers to the narrow grouping that is specified in the statute); *Davies v. Afilias Ltd.*, 293 F.Supp.2d 1265, 1273 (M.D. Fla. 2003) (holding in relation to a defendant's counterclaim that it suffered "loss" under the CFAA after the plaintiff wrongfully registered domain names owned by the defendant, that the alleged "loss" was "not the sort of 'impairment to the . . . availability of data' contemplated by the CFAA").

in this paragraph will not be limited solely to the cost of actual repairs. The Justice Department has suggested that other costs, including the cost of lost computer time necessitated while repairs are being made, be permitted to count toward the [then] $1,000 valuation. I and the other sponsors of this bill agree."); S. REP. 99-432, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2479, 2488–89 ("The Department of Justice has suggested that the concept of 'loss' embodied in this subsection not be limited to the costs of actual repairs. The [Judiciary] Committee agrees and intends that other expenses accruing to the victim—such as lost computer time and the cost of reprogramming or restoring data to its original condition—be permitted to count toward the $1,000 valuation. The Committee wishes to leave no doubt that it intends lost computer time to be covered by this subsection."); S. REP. No. 104-357, at 11 (1996) (explaining that loss can occur without "damage" if, for example, the intruder's conduct "allows the intruder to accumulate valid user passwords to the system, requires all system users to change their passwords, and requires the system administrator to devote resources resecuring the system," then a person can suffer loss but not damage). To allow such a broad reading of "loss" would unduly expand the economic damages that could be obtained in a civil suit under the CFAA.

Thus, the Court will decline plaintiffs' invitation to apply an untested, expansive interpretation of the statute, and it finds that "loss" must relate to the costs incurred in connection with responding to a violation, assessing the damage done, restoring the affected data, program system, or information to its condition prior to the violation, or any costs incurred as a result of the interruption of services. Because plaintiffs do not claim any losses incurred in responding to the

alleged violation, nor do they claim any losses incurred as a result of the interruption of services,[4] the Court finds that plaintiffs have failed to state a claim under the CFAA.

III.    **Plaintiffs have failed to state a violation of due process.**

      A.    **Plaintiffs do not have a property interest in the November 2015 permit, and so they fail to state a claim for a procedural due process violation.**

"[To] make out a violation of due process, plaintiff[s] must show the Government deprived [them] of a 'liberty or property interest' to which [they] had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'" *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014), quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Defendants contend that plaintiffs have failed to state a claim for a procedural due process violation because plaintiffs were not deprived of any property interest. Defs.' Mem. at 8. Plaintiffs claim that when they received their permit on November 9, 2015, they gained a valid property interest that was recognized by the D.C. Circuit in *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068 (D.C. Cir. 2003). Plaintiffs maintain that the permit was constructively revoked, and that they did not receive the procedural protections that were due, when defendants submitted a renewal permit application that was eventually denied by the PSC. Am. Compl. ¶¶ 11, 121–23.

It is true that in *3883 Connecticut*, the D.C. Circuit found that a person has a property interest in a permit. In that case, the District of Columbia issued plaintiff five preliminary permits to begin limited construction activities on a building site while approval of construction plans for the complete project was pending. 336 F.3d at 1069. Plaintiff began work as authorized by the

---

4     Psychas claims that for a few hours the morning of January 15, 2016, she could not access her account because her password had been changed. Am. Compl. ¶ 106. But she does not assert any losses as a result of this brief interruption of services.

permits, but opponents to the construction filed suit to enjoin it, alleging that the permit application form that plaintiff submitted contained errors and omissions.  *Id.* at 1070.  The District Building and Land Regulation Administration ("BLRA") then issued a Stop Work Order ("SWO") to plaintiff, ordering that it halt work on the project until it was in full compliance with D.C. laws.  *Id.*  After four months of administrative appeals, the BLRA rescinded the SWO, and plaintiff was permitted to continue its project.  *Id*.  Plaintiff filed suit seeking damages for the four-month interruption, claiming a violation of procedural due process and equal protection rights.  *Id.*  While the D.C. Circuit ultimately found that plaintiff did not suffer from a procedural due process violation because it had been afforded adequate procedure, it also found that plaintiff had a property interest in the five preliminary permits it was issued.  *Id.*

But what differentiates *3883 Connecticut* from this case is the status of the permit at the time the permit was allegedly constructively revoked.  The permit that plaintiffs received on November 9, 2015 expired by its express terms on November 20, 2015, almost two months before the renewal application was submitted for them and denied.  The face of the permit states: "Start Date: 11/09/2015"; "End Date: 11/20/2015."  Nov. 2015 Permit.  And a description of the permit, states: "Permit Expires: 11/20/2015."  Permit Description.  In *3883 Connecticut*, by contrast, the permits were active: plaintiff had been issued five permits, but then was ordered to stop the ongoing work that was being performed in accordance with their terms.  336 F.3d at 1070.

Plaintiffs take the position that that defendants have "unilaterally declared" that the permit has expired, Pls.' Opp. at 12, and that "[n]othing on the face of Plaintiff Psychas'[s] 'balcony' construction permit lends support to Defendants' declaration that [the November 2015 permit] authorized Plaintiffs' tree house to be present within public space for only a 'temporary' period."  *Id.*  But, the face of the permit incorporated in the complaint belies that assertion – it explicitly

states that it expired on November 20, 2015. *See* Nov. 2015 Permit. Plaintiffs' proclamations to the contrary have no basis in fact, and the Court need not accept inferences unsupported by the facts.

Plaintiffs also submit that "their 'balcony' construction permit is simultaneously an authorization for a completed balcony to occupy public space." Pls.' Opp. at 10. "Thus, [the November 2015 permit] constitutes a valid authorization for the tree house to remain as-is." *Id.* They argue that because a balcony is a permanent structure, it does not make sense that the permit issued to them would be temporary. *Id.* at 13. Plaintiffs are under the impression that November 20, 2015 was not an expiration date – rather it was a "close date" at which time the permit became permanent, meaning that the structure was to be allowed "to remain in public space in perpetuity." *Id.* at 11.

This may not have been an unreasonable impression given the alleged communications with the agency, but a property interest must be grounded in law. To have a property interest in a government benefit, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). An entitlement is derived from "'an independent source such as state law,' *i.e.*, statutes or regulations 'that secure certain benefits and that support claims of entitlement to those benefits.'" *Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997), quoting *Roth*, 408 U.S. at 577 ("Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.").

It is important to keep in mind that the permit in question at this juncture was not simply for the construction of a structure on plaintiff's property; the issue is that portion of permit that enabled plaintiffs to extend a portion of that structure into *public* space, which they could thereby occupy, but never *own*. While a tree house in one's yard could fairly be considered to be a permanent, or at least semi-permanent structure, the face of the permit indicates that it was providing for "Construction / [Public Space] *Rental*." *See* November 2015 Permit (emphasis added). And, plaintiffs have not identified any entitlement to a construction or rental permit that has expired. Psychas may have thought that the permit was a "post hoc ratification of the already built structure," Am. Compl. ¶ 64, but she cannot point to any regulations or state law that state that merely completing construction, even permitted construction in public space, immunizes a structure against future challenges and review. Nor do plaintiffs point to any support for their assertion that a permit's validity continues beyond the point of its expiration date. They do not provide the Court with any basis to believe that an expiration date on a permit is anything other than an expiration date.

Plaintiffs repeatedly assert that "[a]t no time" did Stokes indicate that the permit was "temporary in nature," Am. Compl. ¶ 48, and that Stokes intended that the permit be permanent. Pls.' Opp. at 13–14. However, whatever Stokes's intentions were have no bearing on the status of the November 2015 permit and whether plaintiffs have a property interest in an expired permit.

Thus, because plaintiffs did not have a property interest in the November 2015 permit after November 20, their procedural due process claim fails.

### B. Title 12A and 24 of the D.C. Municipal Regulations and the Mayor's Order 2009-114 are not unconstitutionally vague.

Plaintiffs allege that Mayor's Order 2009-114 and Titles 12A and 24 of the D.C. Municipal Regulations are unconstitutionally vague in violation of the due process clause.

The Mayor's Order establishes the Public Space Committee ("PSC") as a "public body charged with considering and then making final determinations on the approval or denial of applications for use of public space within the District of Columbia." Am. Compl. ¶ 127. Part III.B of the Order provides exceptions to the general rule that any intrusion onto public space must undergo PSC review. *Id.* ¶ 128. Title 12A sets forth D.C.'s construction codes, and Title 24 governs public space and safety.

Plaintiffs assert that none of these regulations "provide distinctions between permit applications that require PSC consideration from applications that do not require PSC consideration," Am. Compl. ¶ 129, and that "[a]s applied to Plaintiffs' tree house permitting efforts, Titles 12A and 24 of the DCMR and Mayor's Order 2009-114 are unconstitutionally vague." *Id.* ¶ 131. They contend that the "vagueness leaves the administrative process susceptible to arbitrary decision-making as to the exact circumstances under which PSC consideration is required prior to the issuance of a permit for construction involving minor permanent use of public space within the District of Columbia." *Id.*

"The Due Process Clause 'requires the invalidation of laws [or regulations] that are impermissibly vague.'" *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 734 (D.C. Cir. 2016), quoting *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). The "[v]agueness doctrine addresses two concerns: 'first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Id.*, quoting *Fox Television*, 132 S.Ct.

at 2317.  "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment."  *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).  "[T]the Constitution is most demanding of a criminal statute that limits First Amendment rights."  *DiCola v. FDA*, 77 F.3d 504, 508 (D.C. Cir. 1996); *see Coates v. City of Cincinnati*, 402 U.S. 611, 616 (1971).  "The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are less severe …."  *Hoffman Estates*, 455 U.S. at 498.

"[R]egulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require."  *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997); *Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 444 (D.C. Cir. 1992).  "When interpreting a statutory term, we are not concerned with vagueness in the sense that the term 'requires a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask."  *United States v. Bronstein*, 849 F.3d 1101, 1107–08 (D.C. Cir. 2017), citing *Coates*, 402 U.S. at 614.

> Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning "specifie[s]" "no standard of conduct . . . at all." [*Coates*, 402 U.S. at 614].  "As a general matter," the vagueness doctrine does "not doubt the constitutionality of laws that call for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson* [*v. United States*], 135 S.Ct. [2551,] 2561 [(2015)] (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

*Id.*; *see United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.").

In light of this authority, the Court finds that the Mayor's Order, Title 12, and Title 24 are not unconstitutionally vague. First, they do not implicate a criminal statute that limits First amendment rights, and they set forth only civil penalties. Thus, a rigorous review is not warranted here. Second, the regulations are sufficiently specific to give a reasonably prudent person fair warning of what the regulations require. The Court notes that plaintiffs do not identify which provisions of Title 12A and Title 24 are impermissibly vague. Each Title is made up of multiple chapters, each of which have a number of provisions within them. The amended complaint seems to assert that the laws in their entirety are vague, but, in their complaint, they assert the laws "as applied to" their "tree house permitting efforts" are unconstitutionally vague. Am. Compl. ¶ 131. But they leave the Court to guess as to which provisions apply to them.

Instead, plaintiffs base their vagueness argument on what they assert is missing from the regulations: "standards or rules that can be objectively applied to govern DDOT decision-making in requiring PSC review of permit applications." Am. Compl. ¶ 132, *see id.* ¶¶ 129–31. But, 24 DCMR § 200.3 and § 200.4 state that:

> 200.3 - The Public Space Committee shall, on recommendation from the Director, determine the public need for public space, what private use may be made of it, and what may be erected or installed in that space.
>
> 200.4 - The Committee shall approve or disapprove all applications for use of public space referred to it by the Director, and no permit for use of public space shall be issued without Committee approval.

These provisions plainly require PSC review for all application for use of public space. Plaintiffs argue that these two provisions are inapplicable to them since they deal specifically with "Rental of Public Space" and they sought a permanent use of public space. Pls.' Opp. at 22. But Psychas's

application to extend their structure into space they admittedly did not own was identified as a "rental application," *see* Ex. D. to Compl. [Dkt. # 1-1] (marked as "Construction / PS Rental"), and the permit that plaintiffs originally received was temporary, not permanent. Indeed, plaintiffs have characterized their entire tree house as temporary as well. Ex. O to Compl. [Dkt. # 1-1] at 2 (stating that the tree house is a "temporary children's play fort").

In any event, 24 DCMR § 100.1 states:

> Occupation of public space beyond the extent permitted by existing law or regulation, or as those laws or regulations may be amended from time to time, is hereby forbidden. The Mayor,[5] however, may authorize the issuance of a permit for a use of public space directly connected with and subordinate to another use of that space which is specifically permitted by some other law or regulation, if the Mayor, on the recommendation of the Public Space Committee, finds that the proposed additional use will not adversely affect the public interest or violate any of the following criteria . . .

> > (a) The proposed additional use will not endanger the public;

> > (b) The proposed additional use will not substantially interfere with pedestrian or vehicular traffic; and

> > (c) The proposed additional use will not increase the area of public space that the applicant for the permit is authorized to use by other law or regulation.

And, the Mayor's Order adds more detail, stating that:

> The [Public Space] Committee shall make final determinations on the approval or denial of all applications for the temporary use of public space, with the following exceptions: . . .

> C. Applications for temporary use of public space or minor permanent use in circumstances where it is not practicable or necessary to convene the full Committee for which the Chair may make final determinations, reporting such actions to the Committee by regular reports. . . .

---

5       The term "Mayor" can mean his "agent, designee, or representative, including the government official designated by law, regulation, or order to perform any act or to exercise any power granted under this chapter." 24 DCMR § 100.3.

Part III, Mayor's Order 2009-114.  The rest of that section goes on to state other situations where PSC review would be unnecessary.

Thus, reading these regulations together, the Court finds that a reasonable person would be put on notice that a permit would be required for any structure that intrudes into public space, and that the permit application may be subject to Public Space Committee review.  *See Metro. Washington Chapter v. District of Columbia*, 57 F. Supp. 3d 1, 30–31 (D.D.C. 2014) (finding that the challenged statute must be read in context).  The Mayor's Order specifies that PSC review is mandatory, unless the use of public space is minor or it is not practicable or necessary to convene the full Committee, among other exceptions.  *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 200 (D.D.C. 2015) (finding that "to the extent practicable" is not unconstitutionally vague), citing *Sproles v. Binford*, 286 U.S. 374, 393 (1932).  So, the regulations are not devoid of any standard of conduct; the provisions set forth standards to apply to determine when PSC review is not needed.  While that requires some interpretation, a degree of discretion does not render a law vague to the point of unconstitutionality.  It is simply "common sense that [officials] must use some discretion in deciding when and where to enforce city ordinances." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005).

Plaintiffs contend that Stokes "tried to fit a square peg in a round hole" when he advised them about their tree house, because there is no provision in Titles 12A and 24 stipulating that balcony construction permits require PSC review prior to approval and that the "regulations do not squarely address the construction of tree houses in D.C. in either private property or public space." Pls.' Opp. at 21.

But this Circuit has recognized that "'specific regulations cannot begin to cover all of the infinite variety of . . . conditions . . . ,' and that "[b]y requiring regulations to be too specific [courts]

would be opening up large loopholes allowing conduct which should be regulated to escape regulation.'" *Freeman United Coal Mining*, 108 F.3d at 362, quoting *Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 730 (6th Cir. 1980), *accord Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (indicating that regulations need not achieve "mathematical certainty" or "meticulous specificity," and may instead embody "flexibility and reasonable breadth").  "While doubts as to the applicability of the language in marginal fact situations may be conceived" the regulations gave plaintiffs "adequate warning" of what was required.  *United States v. Powell*, 423 U.S. 87, 93 (1975) ("[W]e have said that the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.").

The Court finds that, while tree house construction and PSC review of tree houses are not specifically mentioned in the regulations, the regulations still give fair warning as to what was required.  For example, title 12A details the District's "Building Code Supplement," and it provides that "[a] permit shall be obtained . . ." for "new construction, including constructing, adding to or moving a building or structure" or for projections that go beyond one's property line and into public space.  *See* 12A DCMR §§ 105.1.4, 105.1.9, 105.1.10.  Title 24 details the use of public space and sets forth the requirement that a permit is necessary for public space use and that it must undergo PSC review.  And finally, the Mayor's Order provides that PSC review is required for all public space intrusions, unless it falls within an enumerated exception.

Therefore, the Court finds that the regulations are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require, and thus the regulations are not unconstitutionally vague.

### C. Plaintiffs have failed to allege a substantive due process violation.

Plaintiffs' final constitutional challenge alleges that defendants committed a substantive due process violation when a permit was issued in November 2015, that permit closed, a new permit application was submitted on their behalf, and that application was ultimately denied because "DDOT's actions were so outrageous and gravely unfair as to shock the conscience." Am. Compl. ¶¶ 133–45.

"Although [substantive due process] normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest." *George Washington Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003), citing *Roth*, 408 U.S. 569–70. Because this Court already found that plaintiffs have not asserted a valid property interest, plaintiffs' substantive due process claim can be dismissed on that basis as well. But, even if plaintiffs alleged a cognizable property interest, plaintiffs have failed to show that the conduct can sustain a substantive due process violation.

To constitute a substantive due process violation, the defendant official's behavior must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006), quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also*, *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992). Conduct "shocks the conscience" when the "conduct [was] *intended* to injure in some way." *Lewis*, 523 U.S. at 849 (emphasis added).

The D.C. Circuit requires plaintiff to show "grave unfairness" on the part of District officials. *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988). In *Silverman*, the Court held that there were only two ways in which a plaintiff may show "grave unfairness": "[1] a substantial infringement of state law prompted by personal or group animus, or [2] a deliberate flouting of the

law that trammels significant personal or property rights." *Id.* Thus, substantive due process has a "substantiality requirement built in—unlike procedural due process, under which there may be recovery even for nominal damages." *Tri County Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997), citing *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978). The D.C. Circuit has found that "the concept of substantive due process, itself oxymoronic, [applies] to actions that in their totality are genuinely drastic . . . . [U]nless the victim of government imposition has pushed its local remedies to the hilt, it ordinarily will not be able to show the necessary substantiality." *Id.* (internal citation omitted).

This "stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law." *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001); *see also Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *DeShaney v. Winnebago Cnty. Social Servs. Dep't*, 489 U.S. 189, 202 (1989) (the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation"). "[A] breach of local law does not itself violate substantive due process." *George Washington Univ.*, 318 F.3d at 210.

In evaluating plaintiffs' claim, it is important for the Court "to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake and what the city allegedly did to deprive [them] . . . of that right." *Collins*, 503 U.S. at 125 (1992). Plaintiffs here claim that the process they were required to undergo to obtain the proper permit for their tree house was unfair to the point of being a constitutional violation. They claim that they received faulty advice from city officials. Am. Compl. ¶¶ 29–32; 44–48, 136–139. Because of this advice,

they assert that the permit that they were issued on November 9, 2015 became permanent on November 20, 2015. *Id.* ¶¶ 47–48, 140. They claim that when a second permit application was submitted on their behalf and was ultimately denied, that effectively revoked the first permit fraudulently and without their permission. *Id.* ¶¶ 141–43.

Plaintiffs' allegations hardly rise to the level of a substantive due process violation, because plaintiffs have not alleged that defendants' conduct falls into one of the two categories recognized by the D.C. Circuit as showing "grave unfairness." *Silverman*, 845 F.2d at 1080. First, plaintiffs have not pled that a substantial violation of state law occurred – they point to no provision of D.C. law that was violated – or that such a violation was prompted by personal animus. Furthermore, plaintiffs have not alleged a deliberate flouting of the law that trammels significant property rights. While they allege that defendants deliberately executed a "scheme" to "thwart Plaintiffs' rights," Am. Compl. ¶ 142, plaintiffs have failed to assert the requisite substantiality that is necessary to sustain their claim. Substantive due process claims have only been recognized for conduct rising to a serious deprivation of constitutional rights. *See Albright v. Oliver*, 510 U.S. 266, 272 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."); *Norris v. District of Columbia*, 737 F.2d 1148, 1151 (D.C. Cir. 1984) (finding plaintiff stated a claim for a substantive due process violation where corrections officers' brutal and habitual beatings of prisoner shocked the conscience); *Molina-Aviles v. District of Columbia*, 824 F. Supp. 2d 4, 10–11 (D.C. Cir. 2011) ("A conviction obtained through the knowing use of false evidence, or through the knowing failure to correct false evidence, violates [substantive] due process."). Indeed, claims under substantive due process have been dismissed for more serious conduct. *See Lewis*, 523 U.S. at 851–54 (finding that where a motorcycle passenger was killed in a high-speed police chase of motorcyclist, the

allegation that the pursuit was undertaken with deliberate indifference to the passenger's survival was insufficient to state a substantive due process claim); *Tri County*, 104 F.3d at 458–60 (finding where plaintiff's building permit was summarily and without a hearing suspended, plaintiff failed to state a violation of substantive due process).

Given that the alleged violation centers around the denial of a permit for that portion of the tree house that encroaches into public space, the Court finds that this is not egregious conduct that "shocks the conscience." Even without a valid permit, plaintiffs' tree house still stands, and they have not been ordered to take it down. The frustrating reversals that led to this state of affairs are not enough to support a claim for a violation of substantive due process. Therefore, defendants' motion to dismiss is granted as to this count.

## IV. Because the underlying constitutional claims fail, plaintiffs § 1983 claims cannot stand (counts 7 and 8).

In Counts 7 and 8, plaintiffs allege that the individual defendants and the District of Columbia are liable under 42 U.S.C. § 1983. Am. Compl. ¶¶ 161–80. Section 1983 creates a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage . . . subjects . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see Pitt v. District of Columbia*, 491 F.3d 494, 510 (D.C. Cir. 2007). To maintain a section 1983 action, then, plaintiffs must allege a predicate violation of some constitutional right. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Because the Court has found that plaintiffs have failed to state a due process violation, and the complaint sets forth no other constitutional violations committed by any of the defendants, plaintiffs have failed to state a predicate constitutional violation and so their § 1983 claims fail. Thus, the Court need not address defendants' qualified immunity arguments.

**V. Because the federal claims have been dismissed, the Court does not have jurisdiction to issue declaratory judgments pursuant to 28 U.S.C. § 2201(a).**

Plaintiffs request two declaratory judgments against the District of Columbia: (1) that the November 2015 permit is valid; and (2) that plaintiffs' tree house is lawful under the version of 24 DCMR § 109.3 that existed at the time the tree house was constructed, which stated that "beautification of tree space" does not require a permit. *See* Am. Compl. ¶¶ 146–60. They seek this relief pursuant to the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. *Id.* ¶¶ 147, 154.

The Declaratory Judgment Act provides that

> in a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). "Although the Declaratory Judgment Act allows the Court to 'declare the rights and other legal relations of any interested party seeking such declaration,' 'it is not an independent source of federal subject matter jurisdiction.'" *Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.*, 502 F. Supp. 2d 50, 64 (D.D.C. 2007), quoting *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995) (citation omitted). Remedies under the DJA are available only if a "judicially remediable right" already exists. *Gallucci v. Chao*, 374 F. Supp. 2d 121, 128–29 (D.D.C. 2005), *aff'd*, No. 05-5280, 2006 WL 3018055 at *1 (D.C. Cir. Mar. 2, 2006), citing *C & E Servs., Inc. of Washington v. Dist. of Columbia Water and Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) ("[T]he availability of [declaratory] relief presupposes the existence of a judicially remediable right.").

Because the Court has dismissed plaintiffs' federal claims, it has no independent source of federal subject matter jurisdiction, and thus it has no authority to grant plaintiffs' requests for declaratory judgment.

## CONCLUSION

In light of the foregoing, defendants' motion to dismiss is **GRANTED**.

A separate order will issue.



AMY BERMAN JACKSON
United States District Judge

DATE: September 24, 2019